949 A.2d 6

**Lanay BROWN, et al.**

v.

**The DANIEL REALTY COMPANY, et al.**

**No. 01965, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

May 29, 2008.

Brian S. Brown (Saul E. Kerpelman & Associates, P.A., on brief), Baltimore, for appellant.

Michele R. Kendus (Thomas J. Cullen, Goodell, DeVries, Leech & Dann, LLP, on brief), Baltimore, for appellee.

Panel: HOLLANDER, JAMES R. EYLER, MEREDITH, JJ.

MEREDITH, J.

This appeal seeks reversal of a judgment of the Circuit Court for Baltimore City that was entered upon a jury verdict in favor of the defendants in a case seeking damages for lead paint exposure. Appellant—Lanay Brown, through her legal

guardian and next friend Catherlina Queen—and Catherlina Queen, individually, were unsuccessful in persuading a jury that the appellees—Daniel Realty Company, Wendy Perlberg, Daniel Perlberg, and Marvin Perlberg—negligently maintained a house at 3630 Reisterstown Road in Baltimore City, where Ms. Queen and Ms. Brown resided for approximately four years. The plaintiffs claimed that, because of the defendants' negligence, the property contained flaking, chipping, and peeling lead-based paint during the time Ms. Brown resided there. Ms. Queen alleged that Ms. Brown suffered permanent brain damage because of her exposure to the lead-based paint, and Ms. Queen also sought damages on her own behalf for medical expenses that she incurred as Ms. Brown's legal guardian and for severe emotional distress and mental anguish that Ms. Queen allegedly suffered. At the close of the plaintiffs' case, the court granted the defendants' unopposed motion for judgment as to Ms. Queen's personal claims. At the conclusion of all evidence, the case was submitted to the jury on issues, and the jury found there was no flaking, chipping, or peeling paint at the subject property while Ms. Brown resided there. Based upon that dispositive finding of fact, the court entered judgment for the appellees.

Only Ms. Brown noted an appeal. Ms. Brown contends that the trial court committed reversible errors when it: (1) allowed appellees' counsel to read the transcript of the *de bene esse* deposition of one of the plaintiffs' experts to the jury rather than playing the videotape of the deposition; (2) admitted an unredacted copy of a test report that had been prepared by an expert for the plaintiff; and (3) allowed the appellees to read into evidence portions of Ms. Queen's deposition after Ms. Queen's personal claims had been disposed of by the appellees' motion for judgment such that she was no longer an individual plaintiff. For the reasons set forth below, we affirm the judgment of the circuit court.

## Facts and Procedural History

Lanay Brown was born on December 17, 1990. Ms. Queen is Lanay Brown's biological aunt and legal guardian, and Ms.

Queen has cared for Ms. Brown as her defacto mother since the child's birth. Although the parties disputed the exact dates when Ms. Brown resided at 3630 Reisterstown Road, the appellees concede that Ms. Brown's family began their tenancy no later than January 3, 1991, at which time Ms. Brown was two and a half weeks old. Ms. Brown lived at the subject property until 1994, when she and Ms. Queen moved to another address in Baltimore City.

Appellee Daniel Realty Company owned the subject property from 1984 until October 11, 1995, and appellees Daniel Perlberg and Wendy Perlberg, among others, acted as property managers of the subject property. The appellees sold the property in 1995, and since that time, none of the appellees has owned any interest in the property. As a consequence, the appellees had no knowledge of what, if any, painting and repairs were performed at the subject property after October 11, 1995.

On May 26, 1999, at the request of appellant's counsel, representatives of ARC Environmental ("ARC") tested the subject property for the presence of lead. The test results indicated that the property contained lead. The present suit was filed on August 29, 2002.

On June 2, 2006, appellant's counsel took the *de bene esse* deposition for use at trial of appellant's expert who was the representative of the firm that tested the property for lead. Pursuant to Maryland Rule 2–416, the deposition of ARC's President, Shannon Cavalier, was videotaped and stenographically recorded. Although appellant elected not to offer Mr. Cavalier's deposition in evidence as part of the plaintiffs' case at trial, the appellees read most of the deposition transcript to the jury. Two of appellant's questions on appeal arise from the appellees' use of Mr. Cavalier's deposition. At the outset, appellant contends that the trial court should not have permitted the appellees to read the transcript in lieu of playing the videotape. Further, appellant contends that the trial court erred in admitting into evidence the complete test report

prepared by ARC and identified by Mr. Cavalier during his deposition.

Mr. Cavalier testified that he is an environmental expert. His firm performs a variety of real estate services, including tests for the presence of lead. Mr. Cavalier testified that the results of the lead testing performed by ARC at the subject property were summarized in a written report that was marked as Plaintiffs' Exhibit 2 for identification ("the unredacted report") during the *de bene esse* deposition. The unredacted report included a "Lead–Based Paint Testing Data Sheet" that reflected the information recorded by the technicians during the testing process, including descriptions of the rooms and structural components tested, the condition of the paint at each tested location as of the time of testing, and the lead levels, if any, detected during testing. During Mr. Cavalier's deposition, the parties also marked as Plaintiffs' Exhibit 1 a copy of the ARC Report ("the redacted report") which differed from the unredacted report in only one respect: the column describing the condition of the paint at the time of testing had been blocked out by appellant's counsel.

Mr. Cavalier explained that the tests of the subject property were done by technicians from his company using an "XRF machine" that is capable of detecting the presence of lead below the top layer of paint without the need for an intrusive sample. Mr. Cavalier explained that XRF is an acronym for x-ray fluorescence. Using the XRF machine, ARC technicians took 40 readings from various locations throughout the subject property and recorded the readings on a form that is customarily used by ARC. Based upon the data recorded, Mr. Cavalier was of the opinion that there was lead-based paint in two-thirds of the subject property.

On cross-examination, Mr. Cavalier admitted that the XRF test detects lead regardless of whether the lead is in the outermost layer of paint or all the way down at the bottom layer of several layers of paint. He conceded that if a tested door, for example, had once been painted with lead-based paint, and then was painted with ten coats of unleaded paint,

the XRF machine would still give a positive reading for lead, and that reading did not provide any specificity with regard to whether the detected lead was buried beneath several layers of paint. Mr. Cavalier further conceded that some other testing devices, such as a "Niton machine," could determine how close the lead is to the surface, but ARC does not own any of those machines.

When asked about the column of data that had been blocked out on the redacted report, Mr. Cavalier explained that that column of data reflected the condition of the surface of each tested component at the time of testing, indicating whether the paint at that location was either intact, or in fair condition, or in poor condition. The paint is described as "intact" if the paint film is solid and there is no cracking or flaking, and the paint is not separating from the substrate. Of the 38 interior surfaces tested at the subject property, all but two were described in the redacted column as intact, and the other two were in fair condition. ("Fair condition" describes a surface on which the paint is largely intact, but 10% or less of the surface is cracked, worn, or chipping.) Mr. Cavalier acknowledged that "[t]his condition section [of the report] is a piece of information that ... [Mr. Cavalier himself] deemed relevant for an inspector to take note of ... at the time of the inspection."

Trial began on June 19, 2006. For reasons that are not clear, several portions of the trial were not recorded. Nevertheless, the parties have stipulated to the circumstances under which the trial court admitted the evidence appellant now challenges on appeal. The plaintiffs called Ms. Queen to testify during their case-in-chief. She testified that she and Lanay Brown lived at the subject property from the time the child was born in December 1990 until the end of 1994. She testified: "I'm the only mother [Lanay] knew." Ms. Queen acknowledged that when she first moved into the property in December 1990, the paint "was okay." But she recalled that, after five or six months, "the paint was chipping when you go up the stairs," and "in the bathroom, the floor was chipping and the windows [were] chipping."

The appellant also called Dr. Jerome Paulson as an expert witness in the field of childhood lead poisoning. Dr. Paulson is a board certified pediatrician who also teaches environmental and occupational health subjects at the School of Public Health of George Washington University. Prior to trial, Dr. Paulson reviewed a number of documents, including the unredacted ARC report of the lead inspection performed on May 26, 1999. Based upon his review of Ms. Brown's medical records and the ARC report, Dr. Paulson expressed the opinion that the appellant was exposed to lead-based paint at the subject property. Explaining his basis for that opinion, Dr. Paulson testified:

> [T]he CDC [*i.e.*, the Centers for Disease Control and Prevention] points out that the most likely place for a child to be poisoned is in the home in which they live. However, more importantly than that[,] *we have documentation from an inspection done of the home at that address that there was lead paint on the surface, on multiple surfaces at that address.* Lead-based paint was found at over 20 sites at that address when the home was inspected in May of 1999.

(Emphasis added.)

Dr. Paulson identified the ARC report as the only documentation he relied upon regarding the presence of lead-based paint at the subject property. Over appellees' objection, plaintiffs' counsel handed Dr. Paulson a copy of the redacted report which had been marked for identification only. In response to the appellees' objection that the unredacted report was what the doctor had seen before trial, the trial judge ruled: "I'm going to let [plaintiffs' counsel] hand [the witness] a redacted copy. When you get him on cross you can show him an un-redacted copy." Questioning of Dr. Paulson by plaintiffs' counsel continued:

Q. Let me ask you this question. Can you explain to the members of the jury how you can use a test for lead in 1999 to determine whether Lanay was exposed back in 1990 to 1994?

A.  The lead-based paint that's placed on a wall or a floor, or a door jam does not deteriorate over time. So ... it stays there unless it's physically removed it is, it's there. So that's one point.

Also, since 1978 it has been illegal to use lead-based paint for painting interior surfaces in homes. So if one were to assume that there was no lead-based paint at 3630 Reisterstown Road at the time Lanay Brown lived there and that there is lead-based paint or there was lead-based paint on May 26, 1999, one would have to assume that the house, the interior of the house had been painted with lead-based paint between the time she moved out and the time this test was done. Given the age of the home it is very likely that the home was painted with lead-based paint when it was built after it was built [sic] and that that's the origin of lead-based paint. It would make no sense that between 1994 when the family moved out of that address [and] 1999 someone would have gone in and [done] something illegal, that is paint, use lead-based paint in a house.

Based upon the ARC report, Dr. Paulson expressed the opinion that appellant suffered damage, including a loss of IQ, due to lead poisoning caused by her exposure to lead-based paint at the subject property. The appellees' cross examination of Dr. Paulson is one of the portions of the trial for which no trial transcript could be produced.

The individual defendants were also called as witnesses during the plaintiffs' case. During the cross examinations of those witnesses, appellees introduced documentary evidence and testimony tending to show that the property had been thoroughly wallpapered and painted in late 1990 and early 1991, before and shortly after the time the plaintiffs began their occupancy of the premises.

At the close of the plaintiffs' case, the court granted the appellees' unopposed motion for judgment as to the claims asserted by Ms. Queen on her own behalf. During the

defendants' case, over appellant's objection, defendants read excerpts of Ms. Queen's discovery deposition.

Defendants also read the stenographic transcript of Mr. Cavalier's videotape deposition testimony during their case even though the appellant had not utilized that deposition. When appellant objected to Mr. Cavalier's deposition being *read*, and requested that the videotape of the testimony be played instead, counsel for appellees explained to the court that the appellees preferred to read the transcript excerpts to save time and avoid having to stop the videotape at the portions that the court had ruled were inadmissible. The trial court agreed that the transcript could be read to save time.

While presenting Mr. Cavalier's deposition testimony to the jury, appellees offered the unredacted ARC report into evidence. Appellant objected on the ground that the column of the report describing the condition of the paint at the time of testing in 1999 had no relevance to the case because it described conditions at the house five years after Ms. Brown had moved out and four years after appellees had relinquished all interest in the property. Appellees argued that the unredacted report was admissible because the data contained within the report, including the description of the paint's condition, had been relied upon by appellant's experts and, in part, formed the basis of the experts' opinions. The circuit court admitted the unredacted report into evidence.

Following six days of trial, the case was submitted to the jury on issues. *See* Maryland Rule 2–522(c). In response to the first issue, the jury found that there was no flaking, chipping, or peeling of the paint at the subject property while appellant resided there. The verdict sheet instructed the jury to proceed no further if that was its answer to the first issue. Accordingly, judgment was entered in favor of appellees as to all remaining counts. Appellant filed a motion for new trial, raising the same issues that she raises on appeal. Following a hearing, the circuit court denied appellant's motion for new trial, and this appeal followed.

## Discussion

### 1. Reading Transcript of Expert's Deposition

With respect to the trial court's decision to allow appellees' counsel to read the stenographic transcript of the videotape deposition of Shannon Cavalier into evidence, one missing portion of the trial transcript is any discussion that may have transpired between court and counsel on the day the deposition was read. But when the appellees' counsel, at the end of the previous day's proceedings, advised the court of his intention to read the transcript, rather than play the videotape, appellant asserted no objection. The available transcript of that exchange includes the following:

JUDGE MURDOCK: Okay. We are on schedule but I'm not sure where your schedule is anymore. Tuesday at 10:00 we are going to put on the video or are you going to—

[Defense counsel]: We are going to read it.

JUDGE MURDOCK: Read it. Which will take longer?

[Defense counsel]: No, actually it takes much less.

JUDGE MURDOCK: Why, because you are not going to read it all?

[Defense counsel]: We are going to read it but we are not going to have the video pauses—Believe me. Reading a deposition is always quicker than the video and I have done it both ways 15 times.

JUDGE MURDOCK: Believe me, it depends on who's reading it.

[Defense counsel]: It will be [my associate] and I. I'll be on the stand, boom.

JUDGE MURDOCK: Okay.

[Defense counsel]: She will be asking the questions and I will get it out.

[Plaintiffs' counsel]: Don't forget the objections—

[Defense counsel]: I think we've got it all marked.

JUDGE MURDOCK: Okay. And you want me to rule on those objections?

[Defense counsel]: We already have.

JUDGE MURDOCK: Oh, you have.

[Defense counsel]: Yes.

JUDGE MURDOCK: Okay. Good. So you think that's going to take 52 minutes, is that the one that's going to take 52?

[Defense counsel]: 40. It will take 40.

The parties have stipulated on appeal, however, that appellant objected to the trial court permitting appellees to read Mr. Cavalier's deposition into evidence and that this objection was overruled. According to the parties' stipulation, which we will honor because of the lack of a transcript, the appellant argued that Maryland Rule 2–419(a)(3) permits the use of a witness's deposition only upon a showing that the witness is "unavailable," and that appellees made no showing that Mr. Cavalier was not available to testify live. Further, according to the stipulation, the appellant requested that the circuit court require the *de bene esse* videotaped deposition be played, rather than read to the jury, and in response to an inquiry from the court, appellees explained that they preferred to read the transcript rather than play the videotape in order to avoid having to stop the videotape at those portions that the court already had ruled were inadmissible, which, appellees asserted, would save time.

■ Because trial courts have broad discretion with respect to the management of trial proceedings, and in the absence of any contention that the videotape would have in some material way presented Mr. Cavalier's testimony in a light more favorable to appellant than the transcript did, we find no abuse of discretion in the trial court's decision to permit the reading of the stenographic transcript of the videotape deposition.

Appellant contends that the court erred in permitting appellees to read the deposition transcript of a witness because there is no rule that specifically permits that to be done. Appellant notes that Maryland Rule 2–419(a)(3) is not applicable because there was no showing that the witness was unavailable. Appellant further asserts that the express language of Rule 2–419(a)(4) does not permit reading the tran-

script because it makes no mention of using the transcript of a videotaped deposition, but rather permits only the use of the "videotape." Maryland Rule 2–419(a)(4) reads in pertinent part: "A videotape deposition . . . of any expert witness may be used for any purpose even though the witness is available to testify if the notice of that deposition specified that it was to be taken for use at trial."

When the courts are called upon to interpret judicial rules of procedure, the canons of statutory construction are generally applicable. *Hoile v. State,* 404 Md. 591, 624, 948 A.2d 30 (2008); *State v. Williams,* 392 Md. 194, 206–07, 896 A.2d 973 (2006); *State ex rel. Lennon v. Strazzella,* 331 Md. 270, 274–75, 627 A.2d 1055 (1993). We endeavor to discern the plain meaning of the words used in the rule. We seek to give a common sense interpretation to the language of the rule. Further, we do not construe individual rules in isolation, but seek to harmonize rules that deal with related matters. As the Court of Appeals has stated in the context of statutory construction:

> When the statute is part of a larger statutory scheme, it is axiomatic that the language of a provision is not interpreted in isolation; rather, we analyze the statutory scheme as a whole considering the "purpose, aim, or policy of the enacting body," *Serio,* 384 Md. at 389, 863 A.2d at 961; *Drew v. First Guar. Mortgage Corp.,* 379 Md. 318, 327, 842 A.2d 1, 6 (2003), and attempt to harmonize provisions dealing with the same subject so that each may be given effect.

*Anderson v. Council of Unit Owners of Gables on Tuckerman Condominium,* 404 Md. 560, 572, 948 A.2d 11 (2008).

We note that videotape depositions are generally governed by Maryland Rule 2–416, which is captioned "Deposition— Videotape and audiotape." Subsection 2–416(a) authorizes a party to "cause a stenographic record of the deposition to be made." The predecessors of both of these rules addressing videotaped depositions were adopted (as former Rule 410 and former Rule 413 a. 6.) on October 1, 1980, effective January 1, 1981, and we view the reference in Rule 2–419(a)(4) to "[a]

videotape deposition" as a shorthand cross reference to those depositions described in Rule 2–416. Rule 2–419(a)(4) authorized appellees to use the videotape *de bene esse* deposition of the appellant's expert witness. By reading Rule 2–416(a) *in pari materia* with Rule 2–419(a)(4), in a manner that harmonizes the two rules, we conclude that, even though Rule 2–419(a)(4) does not expressly authorize reading the stenographic record in lieu of playing the videotape, the broad authorization in the latter rule, which provides that a deposition of an expert witness taken pursuant to Rule 2–416 "may be used for any purpose even though the witness is available to testify ...," is sufficient authority for a trial judge to permit a party to read the stenographic transcript rather than play the videotape in the absence of an assertion that viewing the videotape somehow presents a different impression of the witness's testimony. Appellant has not asserted that the transcript of Mr. Cavalier's videotape deposition somehow distorted the testimony or created a different impression of the witness than the jury would have gained upon viewing the recording. In contrast to *Rush v. State,* 403 Md. 68, 104, 939 A.2d 689 (2008), where the Court of Appeals held that "inferences drawn from viewing the interview DVD, through observation of the infl[e]ctions and demeanor exhibited by both [the defendant] and [the interrogating officer], may differ from those inferences that can be drawn from the bare transcript," appellant in this case has made no argument whatsoever that the jury might have drawn different inferences from viewing the videotape of Mr. Cavalier's deposition than those it drew upon listening to a reading of the transcript. Given the lack of any asserted prejudice caused by reading the transcript in lieu of playing the videotape, and in view of defense counsel's uncontroverted proffer that reading the transcript would, in this instance, save time, it was not an abuse of discretion for the trial judge to permit the transcript to be read.

### 2. The unredacted version of the ARC Environmental report

Appellant contends the circuit court erred by admitting into evidence the unredacted version of the ARC Environmental

report from 1999 because, in appellant's view, the unredacted report contained a column of totally irrelevant data that was prejudicial to appellant's case. Appellant contends the appellees should not have been permitted to question Mr. Cavalier about the condition of the paint on the date of the testing, and appellees respond:

> In this case, the evidence of the condition of the paint was not admitted to prove the condition of the paint at the time the Appellant resided at the property, but rather was appropriately admitted in accordance with Maryland Rule 5–703(b), as data reasonably relied upon by Appellant's own expert.

According to the appellees, their line of questions about the condition of the paint during the testing by ARC, together with the unredacted report, "was proper to assist the jury to understand fully how the testing was performed, and to prevent the jury from making an improper inference that the [ARC] data proved that there was lead paint at the property on the surface where a person could be readily exposed."

■ We agree with appellees that the jury was entitled to know what conditions were observed by appellant's experts on the date those experts tested the house for the presence of lead. Appellant's fear that the jury might not be able to comprehend that the testing took place many years after appellant vacated the property gives the jury little credit for being able to understand the testimony that made that particular point absolutely clear. What was less clear from the ARC report was whether the lead that ARC detected by using the XRF machine was on any exposed surface of paint on the date of the test, and whether the jury could reasonably infer from ARC's positive lead readings that Ms. Brown was directly exposed to lead in the subject property.

The data reflected in the condition column of the unredacted report was the only information in the ARC report that made it plain that, with very few exceptions, the lead detected by the XRF machine was subsurface lead. The condition column was evidence that: (a) the ARC test for the presence of lead

could produce positive readings even though there was not currently any flaking or chipping paint at the site of the test reading; (b) the mere fact that the test could confirm that there had been lead paint at some point in the past did not permit one to conclude that there is currently any flaking or chipping paint in the areas that produced the positive lead readings; and (c) Dr. Paulson's testimony that the ARC report showed that "there was lead paint on the surface, on multiple surfaces" at the subject property at least exaggerated, and arguably misrepresented, the amount of lead paint found *on* surfaces when the home was inspected by ARC in May of 1999. On all of those points, the information about the condition of the tested surfaces meets the legal standard for relevance set forth in Maryland Rule 5–401. The jury was entitled to know the data in the condition column in order to assist the jury in understanding the test results and limitations on the inferences one could draw from those test results.

Rule 5–401 provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 5–402 provides "all relevant evidence is admissible" unless otherwise excluded by constitutions, statutes, other specific rules of evidence, or Maryland case law. In ruling that the unredacted report was admissible, the court ostensibly concluded, consistent with Rule 5–403, that its probative value outweighed any danger of confusing or misleading the jury. Here, the trial judge did not err in concluding that the unredacted report was relevant and admissible.

Moreover, appellees correctly assert that, even data that might not otherwise be admissible may, under Rule 5–703(b), be properly admitted if it is relied upon by an expert or is necessary to illuminate testimony. Rule 5–703(b) provides:

If determined to be trustworthy, necessary to illuminate testimony, and unprivileged, facts or data reasonably relied upon by an expert ... may, in the discretion of the court, be disclosed to the jury even if those facts and data are not admissible in evidence. Upon request, the court shall in-

struct the jury to use those facts and data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference.

Here, the unredacted report was admissible under Rule 5–703(b). Mr. Cavalier testified on direct examination that he formed an opinion that the property contained lead-based paint based on his review of the data in the un-redacted report and that he deemed the data describing the condition of the paint at the property trustworthy and relevant to the lead paint inspection. The jury was entitled to know that the report upon which he based his opinions included a column that indicates that nearly all of the painted surfaces in the house were intact at the time this report was prepared. Additionally, appellant's medical expert witness, Dr. Paulson, testified that he relied upon the ARC report in forming an opinion that Ms. Brown was exposed to lead at the subject property. As noted above, because of limitations in the ability of ARC's XRF machine to determine which strata of the paint contained the detected lead, the 1999 test did not establish that there was exposed lead paint on surfaces in the property during the years appellant lived there. Yet, Dr. Paulson cited the ARC report as "documentation" of lead "on multiple surfaces" of the subject property. Appellant had provided Dr. Paulson with the unredacted report for his review. Because both of the appellant's experts had the opportunity to consider the data regarding condition at the time of testing, the unre- dacted report was appropriately admitted under Rule 5–703(b) "for the purpose of evaluating the validity and probative value of the expert[s'] opinion[s] or inference[s]."

### 3. Reading excerpts of Ms. Queen's deposition

As previously noted, portions of the trial proceedings could not be transcribed, and we have no trial transcript of appel- lant's objection to the court's decision to permit the appellees to read into evidence excerpts of the discovery deposition of Ms. Queen. The parties have stipulated on appeal that, near the close of appellees' case, appellees requested that they be permitted to read into evidence certain portions of the discov-

ery deposition of Ms. Queen. By that point in the proceedings, Ms. Queen's personal claims had been eliminated because the court had granted the defendants' motion for judgment as to those claims at the close of the plaintiffs' case. The parties have no specific recollection of what was actually read into evidence, but stipulate that some testimony from Ms. Queen's deposition was read in by the appellees. The parties stipulate further that appellant objected to the trial court permitting Ms. Queen's discovery deposition testimony to be read into evidence, and that the court overruled this objection.

In support of appellant's objection, appellant argued that Ms. Queen was no longer a party to this case at the time the deposition was offered into evidence, and her deposition was therefore not admissible pursuant to Maryland Rule 2–419(a)(2). Appellant contends that Maryland Rule 2–419(a)(2), which provides that a "deposition of a party ... may be used by an adverse party for any purpose," was no longer applicable to Ms. Queen, who was, at that juncture, merely a "next friend." *See Berrain v. Katzen,* 331 Md. 693, 703, 629 A.2d 707 (1993) (suggesting that a next friend is " 'an officer of the court'," who " 'stands very much in the relation of an attorney to the case.' ") (quoting *Deford v. State, Use of Keyser,* 30 Md. 179, 199 (1869)); *see also Thomas v. Safe–Deposit & Trust Co. of Balt.,* 73 Md. 451, 23 A. 3, 4 (1891).

In support of admitting the deposition excerpts, appellees argued that Ms. Queen was a party to the case at the time the deposition was taken and at the time of her direct examination at the trial of this matter. Appellees further argued that, as next friend of the plaintiff, Ms. Queen was essentially an agent for appellant, and therefore her testimony was admissible pursuant to Maryland Rule 2–419(a)(2). Appellees further argue in this Court that, even if there was any error in permitting appellees to read Ms. Queen's deposition, such error was harmless because she had already testified and had been cross examined about her deposition testimony.

Although the parties have focused primarily upon language in the discovery rules pertaining to the use of depositions, in

the absence of restrictive provisions in those rules prohibiting the appellees' use of such evidence, the rules of evidence control the question of whether the trial court erred in admitting the challenged evidence. *See* Rule 5–402 ("Except as otherwise provided by . . . these rules, all relevant evidence is admissible.").

Ms. Queen's status as the legal guardian of appellant, as well as a former co-plaintiff, and the "next friend" who filed and prosecuted this suit, raises the possibility that her deposition testimony could have been properly admitted under Maryland Rule 5–803(a) as a statement by a "party-opponent." That rule provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(a) **Statement by party-opponent.** A statement that is offered against a party and is:

(1) The party's own statement, in either an individual or representative capacity;

(2) A statement of which the party has manifested an adoption or belief in its truth;

(3) A statement by a person authorized by the party to make a statement concerning the subject;

(4) A statement by the party's agent or employee made during the agency or employment relationship concerning a matter within the scope of the agency or employment; or

(5) A statement by a coconspirator of the party during the course and in furtherance of the conspiracy.

We observe, without deciding, that subsections (a)(2), (3), and (4) might, depending upon the circumstances, be applicable to the statements made by Ms. Queen during her deposition in this case.

But we need not resolve the interesting issues raised by the parties regarding the legal status of a next friend or the use o f a deposition of a witness who was previously a party but is no longer a party to the case. In our view, the circuit court did not err by permitting appellees to read into

evidence relevant portions of Ms. Queen's deposition, even though she was no longer pressing her individual claims against appellees by that point in the trial proceedings, because (1) the inconsistent deposition testimony was admissible as substantive evidence under Rule 5–802.1(a), and (2) to the extent that the deposition testimony was not inconsistent with the trial testimony, its admission was harmless error.

Rule 5–402 provides that "all relevant evidence is admissible" "[e]xcept as otherwise provided by constitutions, statutes, or these rules, or by decisional law not inconsistent with these rules." Appellant does not contend that the deposition excerpts were not relevant. To the contrary, appellant argued that she was prejudiced because the deposition excerpts were so at odds with Ms. Queen's trial testimony that Ms. Queen's credibility was impaired when the court admitted the deposition evidence. Appellant argues in her brief: "The purpose of this exercise was to impeach the prior testimony of Ms. Queen.... Appellees should not have been permitted to read in Ms. Queen's deposition to impeach her credibility...." Appellant further contends that, during closing argument, counsel for appellees made reference to this attack on Ms. Queen's credibility when appellees argued:

> Ms. Queen testified there was chipping and peeling paint at the property, no doubt about it. But I ask you to think about when I read portions of her deposition she didn't remember anything about the house. She didn't remember if father and mother lived there....

Clearly, the deposition excerpts meet the definition of relevant evidence set forth in Rule 5–401, quoted above.

Although appellant complains about the impeaching effect of the appellees reading Ms. Queen's deposition testimony, any inconsistent deposition testimony of Ms. Queen, was admissible pursuant to Rule 5–802.1(a)(1) and (3), which provide:

> The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:

(a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at a trial, hearing, or other proceedings or in a deposition; ... or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement; ....

See JOSEPH F. MURPHY, JR., MARYLAND EVIDENCE HANDBOOK § 700(A) at 257 (3d ed. 1999) ("Under Md. Rule 5–802.1(a), ... three kinds of prior inconsistent statements are now admissible for more than the limited purpose of impeachment."). See also Nance v. State, 331 Md. 549, 569, 629 A.2d 633 (1993) (holding, prior to the adoption of the Maryland Rules of Evidence, that testimony given by a witness before a grand jury is admissible as substantive evidence if the declarant is present as a witness at trial and subject to cross-examination regarding the prior statements).

In this case, the deposition excerpts were prior statements made by a witness who testified at the trial. Although Ms. Queen was no longer on the witness stand at the time the deposition excerpts were offered, she was still available at trial for examination by the appellant, and appellee therefore met the condition of Rule 5–802.1 that the witness must be "subject to cross-examination concerning the [prior inconsistent] statement[s]." Under such circumstances, the witness's deposition testimony was admissible pursuant to Rule 5–802.1(a) to the extent the deposition testimony was inconsistent with her testimony at trial. Because this evidence was admissible as substantive evidence pursuant to Rule 5–802.1(a), it was not subject to the same restrictions that apply to inconsistent statements offered solely for impeachment purposes pursuant to Maryland Rules 5–613 and 5–616.

Assuming, arguendo, that some portions of Ms. Queen's deposition testimony were not inconsistent with her trial testimony and therefore were not admissible under Rule 5–802.1(a)—or Rule 5–803 or Rule 2–419 or any other rule—appellant demonstrated no prejudice from the admission of such consistent deposition testimony. Indeed, to the extent

that any of the deposition testimony appellees read was not inconsistent with Ms. Queen's trial testimony, we fail to see how permitting the appellees to offer such consistent deposition testimony could have prejudiced the appellant who called Ms. Queen as a witness in the first instance. *See Owens–Illinois, supra,* 325 Md. at 445, 601 A.2d 633.

The appellate courts of Maryland "will not reverse a lower court judgment if the error is harmless." *Flores v. Bell,* 398 Md. 27, 33, 919 A.2d 716 (2007). *Accord Crane v. Dunn,* 382 Md. 83, 91, 854 A.2d 1180 (2004) ("It is the policy of this Court not to reverse for harmless error and the burden is on the appellant in all cases to show prejudice as well as error."); *Hance v. State Roads Comm.,* 221 Md. 164, 176, 156 A.2d 644 (1959) ("Courts are reluctant to set aside verdicts for errors in the admission or exclusion of evidence unless they cause substantial injustice."). Appellant has not argued that she was in any way prejudiced by the appellees reading the passages of Ms. Queen's deposition testimony that were consistent with her trial testimony. Consequently, even if the trial court erred in permitting some consistent deposition testimony of Ms. Queen to be read, the admission of such cumulative testimony was harmless.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**