7 A.3d 125

**Ronald MEYR**

v.

**Chona MEYR.**

**Ronald Meyr**

v.

**Chona Meyr.**

**Nos. 2936, Sept. Term, 2009, 362, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

Oct. 27, 2010.

Cynthia E. Young, Annapolis, MD, for Appellant.

Craig S. Sewell, Centreville, MD, (Jean D. Meta, Chester, MD, on the brief) for Appellee.

Panel: MATRICCIANI, GRAEFF and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

GRAEFF, J.

On February 1, 2010, the Circuit Court for Queen Anne's County awarded the parties, appellee, Ms. Chona Meyr, and appellant, Mr. Ronald Meyr, a limited divorce. This appeal arises from orders of the circuit court regarding: (1) Ms. Meyr's visitation rights; and (2) payment of attorneys' fees for the best interest attorney and for Ms. Meyr in connection with the appeal initiated by Mr. Meyr.

Mr. Meyr presents the following questions for our review, which we quote:

1.   Did the trial court exceed its authority when it delegated to the best interest attorney the decision of how long family reunification therapy would continue?

2.   Did the trial court properly exercise its discretion when it failed to specify the day and time of visitation?

3.   Did the trial court abuse its discretion when it ordered appellant to pay for all of the services of the best interest

attorney and to pay advanced appellate attorney's fees to appellee?

For the reasons set forth below, we agree that the court improperly ordered Mr. Meyr to pay the best interest attorney's fee. Otherwise, we shall affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. and Ms. Meyr were married in 1996. The parties had three children, a daughter born on January 7, 1998, and twin girls born on September 8, 2000. On April 6, 2009, Ms. Meyr filed a Complaint for Absolute Divorce, or in the Alternative, Complaint for Limited Divorce.

On May 21, 2009, a Pendente Lite Hearing was held before a Master. At the hearing, the Master found that Ms. Meyr had "not been permitted to see, or have contact with the children since she left." The court subsequently issued several orders, providing for Ms. Meyr to have visitation with the children, ordering Mr. Meyr to pay alimony to Ms. Meyr in the amount of $600.00 per month, and appointing Jean Meta, Esquire, to represent the minor children. The court ordered Mr. Meyr to pay the attorney a deposit of $750, indicating that "a final allocation of fees will be determined by the Court at the hearing on the merits of the case, or upon motion of child's counsel."

On July 21, 2009, Mr. Meyr filed a motion to amend the Pendente Lite Order, arguing that unsupervised visitation with Ms. Meyr was not in the best interest of the children "due to the problems the children have been having before[,] during[,] and after the supervised visitation, and the concerns of the children's therapist." Mr. Meyr also claimed that Ms. Meyr's home was not a suitable location for unsupervised visitation because she lived with a person with "an extensive criminal record." Mr. Meyr asked the court to extend supervised visitation.

On July 30, 2009, Ms. Meyr filed a Motion for Order of Contempt and Motion to Enforce Order, arguing that Mr.

Meyr was not complying with the order to give her unsupervised access to the children, and he had failed to make alimony payments as ordered. A Show Cause hearing was scheduled for September 22, 2009.

On August 7, 2009, Ms. Meyr filed an Answer to Mr. Meyr's motion to amend the Pendente Lite Order, stating that the individual with a criminal record about whom Mr. Meyr complained in his motion had lived with Mr. and Ms. Meyr and their older daughter while the parties were married, and that Mr. Meyr did not make "sufficient allegations to constitute a Petition to Modify Custody." On August 12, 2009, the court denied Mr. Meyr's motion to amend the Pendente Lite Order.

On August 21, 2009, Mr. Meyr filed a Motion to Modify Visitation. He argued that unsupervised visits were not in the best interests of the children, alleging that the children refused to participate in unsupervised visitation, and that Ms. Meyr "involved the Sheriff's Department Deputies in attempting to force the children to attend." He stated that the court-appointed best interest attorney agreed that unsupervised visitation was not in the children's best interest.[1] Mr. Meyr requested that the court schedule an emergency visitation hearing and "[m]odify the Order to continue visitation at the Visitation Center until the Therapist and Children's counsel believe it is appropriate for unsupervised visits."

On August 24, 2009, Mr. Meyr filed an Answer to [Ms. Meyr's] Motion for Order of Contempt and Motion to Enforce Order. Mr. Meyr asserted that he had informed Ms. Meyr's counsel prior to July 26, 2009, that the transportation of the children was Ms. Meyr's responsibility and that, due to the "extensive criminal history" of the individual with whom Ms. Meyr resided, Mr. Meyr did not want the children at Ms. Meyr's home. Mr. Meyr claimed that the children refused to visit with Ms. Meyr and that it was not in the children's best

---

1. Ms. Meta filed her Answer to Mr. Meyr's Motion to Modify Visitation on September 8, 2009. In her Answer, she requested that "visitation between the minor children and [Ms. Meyr] continue in a supervised setting."

interest to be forced to do so. Mr. Meyr also admitted that he had failed to pay alimony to Ms. Meyr, but he claimed that he was in the process of putting wage withholding in place with his employer.

On September 22, 2009, a Show Cause hearing took place. Mr. Meyr promised to pay Ms. Meyr alimony of $1,200 immediately, and he was ordered to pay arrears in the amount of $1,200 by November 23, 2009. The parties agreed to participate in, and split evenly, fees for family reunification therapy. The contempt matter was continued until November 23, 2009, but after the parties resolved the issues, the court dismissed the Petition for Contempt.

On January 19 and 20, 2010, trial proceeded. The circuit court made extensive findings of fact, which the parties adopt, in its February 1, 2010, Memorandum Opinion and Judgment of Limited Divorce, as follows:

> Mrs. Meyr is a native of the Philippines, while Mr. Meyr is a citizen of the United States. The two met in 1996, when Mr. Meyr placed an advertisement for a wife in a newspaper, to which Mrs. Meyr responded. After brief correspondence and a short trip by Mr. Meyr to the Philippines, Mr. Meyr paid for Mrs. Meyr's transportation to the United States and the two married on December 22, 1996 in a religious ceremony in Chester, Maryland. It is reasonable to conclude that before marrying, the two had not explored in depth what they had in common and had not thrashed out their views toward their mutual marital and parental obligations. Mrs. Meyr spoke little English and Mr. Meyr did not speak her Philippine dialect. Nevertheless, the marriage produced three children; [a daughter] on January 7, 1998; and then twins [ ], born on September 8, 2000.
>
> For many years, Mr. Meyr had been working and still works in a family enterprise, Island Builder Services, Inc.[2] Mrs. Meyr, a high school graduate in the Philippines, had no

---

2. The trial court found that "Mr. Meyr owns 40% of the stock of Island Builders Services, Inc., [and] his mother, Betty Meyr, owns the remaining 60%."

real marketable skills and brought no financial assets to the union. In the early years of the marriage, the couple lived together in their own homes, but in August of 2007, they moved in with Mr. [Meyr's] mother, Betty Meyr, in her house, which also serves as the office for the family enterprise. Mr. Meyr's younger, unmarried brother, Tom Meyr, who is also an employee of Island Builders, lives with them in their mother's home. The children, of course, moved with them and remain in Betty Meyr's household to this day. Over the months that Mrs. Meyr lived in that household, she claims that her mother-in-law established the rules for the family and, in league with Mr. Meyr, pushed her aside. The effect of this was to discharge her from many of the parental responsibilities she exercised before they combined households. All testified that Mrs. Meyr has been assigned to learn English on her own, so that she could help with homework and assist the daughters as they grew and evolved into adults.

On March 22, 2009, Mrs. Meyr left the marital home and alleged that Mr. Meyr had been abusing her physically and mentally for an extended period of time. She claimed that it was only when she learned that, as a permanent resident, she was immune from deportation that she [felt] free to leave. Although Mrs. Meyr had worked briefly for Island Builders in some menial capacity, she never received any pay personally, nor was she allowed to keep pay from her employment at High's convenience store.[3] Her pay went directly into their family account and she received cash when Mr. Meyr believed it necessary for her to have some. After Mrs. Meyr acquired employment out of the home (at High's), Betty [Meyr] assumed responsibility for tending to the children and maintained she charged her son's family $1,000 per month for rent. The rent was never actually paid over, but maintained as a bookkeeping record. Betty Meyr also claimed to have billed them $1,400 for childcare

---

3. The court noted that there was testimony Ms. Meyr worked at a High's store for an eighteen month period.

and transportation, but testified that it was also only a bookkeeping deduction from her son's monthly pay.

In justification for his reluctance to allow the children to visit with their mother and for his consequent insistence on only supervised visitation, Mr. Meyr claimed that his wife had been unfit to meet the children's needs for many reasons, mostly arising from her limited ability to speak English and failure to educate herself as he said that she had agreed to do. He also alleged some physical abuse of the children, which Mrs. Meyr strongly denied. According to Mr. Meyr and his mother, they obtained numerous books for her to use in self-education and provided time for her to study by herself in her room, while he and his mother cared for the children. According to Mrs. Meyr, she was sent to, and even on occasion locked in, her room with the study assignments and away from the family. Mr. Meyr claims that she voluntarily isolated herself from the children and the family.

By all accounts, the children are exceptionally bright, do very well in school, and have enjoyed a comfortable life to the present day. For several years, Mr. Meyr provided karate lessons, a sport in which all three excel and which creates a monthly expense of $100 per child. While they were all living together as a family, Mr. Meyr took them on several vacations, including on a holiday trip with his mother and brother to Disney World. Although there were allegations by Mr. Meyr of maternal neglect at previous times, such as "allowing the children to wander unsupervised throughout the neighborhood" and "losing" one child briefly in an airport ladies room, there was no convincing evidence of any mistreatment or neglect of the children when they were in the care of their mother. Mr. Meyr also made claims that one of Mrs. Meyr's good friends was a bad influence.[4] All of Mr. Meyr's claims made during the

---

4. The court noted that "Tom Meyr testified that the friend had bipolar disease," but the court found that claim to be "unsubstantiated and irrelevant."

hearing fell far short of supporting an inference of Mrs. Meyr's poor parenting. Most significant to the Court was the evidence that Mr. Meyr treated his wife not as an equal, but as someone to whom, like a child, he could assign reading and study assignments and could control friendships.

Cynthia Browne, a licensed family therapist with 25 years of experience, agreed to interview the family and report to the Court on her findings about the children and the family dynamics. She met with the children on six occasions, with Mrs. Meyr on four of them, and with Mr. Meyr on only the family's second visit. According to her, the first session went well, but from then on, the sessions deteriorated and she concluded that Mr. Meyr and his mother were actively discouraging the children from cooperating. During the session that Mr. Meyr attended, he was contentious and indicated the sessions interfered with his work. At the sessions, the children expressed low regard for their mother and expressed beliefs that she was stupid because of her limited English. Ms. Brown [sic] also overheard conversations Betty Meyr had with the children in which she indicated that, by staying strong, they would succeed in what they had been doing and would "turn the tables on them."

Highly significant to the Court was Ms. Browne's professional opinion that the fighting over visitation and custody, together with the children being programmed to oppose their mother, supported the allegations that Mr. Meyr has placed the children in profound jeopardy of lasting psychological damage. The children expressed opinions that their mother was "a vicious nasty person" who "refuses to learn,["] is "not smart," and "can't work." The children also expressed an opinion that Mrs. Meyr should "go back to her own country." Ms. Browne opined that the girls were, at their critical and tender ages, being programmed to be "cruel and unfeeling" adults. The notes taken by those workers who observed the children during supervised visitation at For All Seasons Visitation Center on other occasions

supported the conclusion that the children were being encouraged not to cooperate with the visitation.

Mr. Meyr vigorously requested that the court interview the children. Mrs. Meyr and Jean Meta, the best interests attorney, opposed the Court's interviewing them and grounded their opposition on two claims. First, that the children lacked the judgment and maturity to assist the Court in determining custody and visitation, and second, that the children had become essentially tools for their father in the litigation and had been programmed to testify falsely in his support. Over their objections, the Court did not interview them on the record. In order to allay fears that the children might be influenced by Mr. Meyr or his mother in bringing them to court, Mr. Meyr's attorney volunteered to go to their school and transport them herself. Because of the restricted space in chambers and the inability to record the interview there, the court sat without a judicial robe at Mr. Meyr's counsel table and spoke with all three separately. Shelly Coleman, the Queen Anne's County Family Services Coordinator, Jean Meta, the best interest attorney, and the court reporter also were present and listened but did not take part during the interviews.

The interviews confirmed the testimony of the exceptional intelligence of all three children. They appeared well groomed, relaxed, and fully aware of the purpose for the interviews, as well as eager to support their father in his claims about their mother's unfitness to have custody or to visit with them. They claimed that their mother had physically abused them, but could point out only some unwanted hugging in connection with picture-taking during supervised visitation. At least one child claimed that all three had agreed that, if they were forced by the Court to have a close relationship that included unsupervised visitation, they would run away and not abide by the Court order, a statement that seemed totally contrived. Most remarkable was their complete denial of any love for their mother and any empathy for their mother's feelings or point of view in this dispute. [The older daughter] contradicted her father's

testimony that they had discussed the case briefly that morning on the way to school, claiming that the last time they had discussed the case was several weeks before. One of the twins said that their mother had caused them not to have a 2009 Christmas vacation because of the expenses of the court case. Most noteworthy was the mechanical and robotic convergence of their testimony, which showed that they most likely had been extensively coached by their family as to what to say. It is also clear that their expressed lack of love and respect for their natural mother is the result of the positions taken by their father in this litigation.

Mr. Meyr called his mother, Betty Meyr, to testify at the hearing as to her observations about her son, her daughter-in-law, and the children. She impressed the Court as an able and strong businesswoman who is completely convinced that [ ] Mrs. Meyr's participation in [the children's] lives would not be in their best interest. However, her demeanor and testimony confirmed that she was working actively to undermine Mrs. Meyr's relationship with her children. She denied any mistreatment whatever by her son of Mrs. Meyr, and said that the alleged incidents that Mrs. Meyr claimed, like being locked in her room and choked on occasion, never happened. She showed a great deal of bias when she departed from simple answers to make other points in her son's favor, and attempted to damage Mrs. Meyr's case for visitation or custody. Her testimony about earnings and expenses for her son was utterly unconvincing and unhelpful to the Court, as she appeared to be hiding his actual earnings and take-home pay. It is abundantly clear that she is completely [in] control of Island Builders Services, controlling the books as well as all of the other managerial functions. It is also clear that Betty Meyr decides how much her sons earn in their employment.

Mrs. Meyr has alleged that Betty Meyr is a central cause of the problems in the household and is guiding the custody action. It is not important to the Court's conclusion whether this is accurate, but Betty Meyr's testimony showed her

to be a powerful, opinionated woman who is capable of having participated negatively in the events surrounding the visits to the family therapist, Cynthia Browne, and having pushed aside Mrs. Meyr in the child rearing as alleged.

It is not possible to determine clearly just what the character of the Meyr marriage was before the separation, but it is reasonable to conclude that it started without any real love, affection, or real intellectual compatibility. The union produced accomplished children whom both Mr. Meyr and Mrs. Meyr deeply love, but the marriage definitely was not and has not been between equals who shared in the important decisions affecting their lives or the lives of their children. The testimony and evidence did not show that Mr. Meyr demonstrated any love or respect for his partner, and since the breakup, the testimony showed that Mr. Meyr has attempted to exclude Mrs. Meyer from all of the critical decisions regarding their children. He had made arrangements for their extensive dental care, switched schools for one daughter, and generally proceeded to act without consulting with or considering the wishes of their mother. He candidly stated in his testimony that he does not believe her opinion on matters regarding the children is important or valuable. It is reasonable to conclude that his attitude and opinion are not of recent origin and may have endured through most of the marriage, perhaps even from the very beginning.

During the period since separation, Mrs. Meyr has been working for a minimum wage without benefits at Royal Farms, another convenience store. She has no transportation, lives in a rented room, and is saving funds accumulated from her *pendente lite* alimony to purchase a car. She currently has no driver's license, but is making arrangements to acquire one. She has persevered in her efforts to establish maternal relations with her children in spite of their hostility and unkind words and actions. Thirteen years after coming to a strange land and after having been financially dependent in a marriage, she is now for the first

time trying to begin a new life on her own, under considerably altered conditions and diminished living arrangements.

Since the separation, Mr. Meyr has had total custody of all three children, while he continues to live with his mother and brother. He exercises complete decision making authority and sends letters to Mrs. Meyr about the children because that is what he "believes the court wants him to do." He has the exact standard of living that he enjoyed for many years before the separation, and continues to provide his children with the standard of living that they have always enjoyed.

(Footnotes omitted).

Based upon these factual determinations, the trial court concluded that steps toward family reunification were necessary. The court set forth its conclusions as follows:

The Court's conclusions regarding the marriage and the breakup are harsh. It is clear to the Court that the marriage from the very beginning was not one between equals who were to share a life together and take joint pleasure together in the raising of the children. Most likely from the very beginning, Mr. Meyr regarded his wife as little more than the bearer of his children and a maid or servant in his household, not fully able to discharge her parental duties without substantial further education. He concluded that her English skills, which he had to appreciate from the outset, were far below his and those with whom he associated. He says this is why he assigned her the responsibility of making up what he perceived as her "insufficiency." Her inability to live up to his present requirements could scarcely have come as a surprise to him. His testimony that she "agreed" to learn English to the level where she could assist their children is completely unavailing and does not justify what he has done since then, shunting her aside as he substituted himself and his mother for the maternal role that his wife was and is entitled to enjoy.

The Court concludes from the expert opinion and the believable testimony from others that the children are in severe danger of psychological injury that could follow them into adulthood. The Court finds from the evidence that Mr. Meyr and his strong-willed mother, assisted by his brother, have combined to alienate the three children from Mrs. Meyr. Together they have caused these children to discard the natural, healthy, and appropriate children/parent relationship, to which they have a right as well as a necessity to develop during their childhood. The Court regards the current state of affairs in the interests of the children call for immediate modification of their current arrangement with the now-divided parents. That means an adjustment in the current visitation and custody orders, the continued involvement of the children's best interest attorney, Jean Meta, and continued supervision by the Court.

Repairing the existing bad relations of the children and their mother, and reestablishing normal and proper relations, may progress slowly and with difficulty. The Court believes that much depends on the goodwill of Mr. Meyr, his brother, and his mother, even though undoubtedly, they will disagree and may want to resist. Nevertheless, their sincere cooperation will certainly shorten and simplify the process. The Court periodically will have to continue to monitor and to evaluate the children's progress toward establishing proper healthy relations with their mother, as well as their father. The custody, support, and alimony orders in this case are designed with therapy to renovate the parental relationships and to cure the harm that Mr. Meyr and others have thus far caused to the normal and healthy mother/daughter relationships.

The Court thoroughly appreciates the difficulty of the task that confronts all those involved in this family. As stated above, reunification may take a great deal of time and will incur substantial expense. The Court concludes, however, that the responsibility for the state of affairs falls entirely on Mr. Meyr and he should bear the entire liability

for paying for the repair. Mrs. Meyr is not today in financial condition to pay any part at all.

Mrs. Meyr does not yet have the living arrangements nor the income to have physical custody of her children. As a temporary arrangement, the court is awarding physical custody to Ronald Meyr and ordering the two parents to share legal custody. The court is also ordering the children's best interest attorney, Jean Meta, Esquire, to oversee the children's therapy. As such, the Court is vesting with her the power to direct family reunification therapy subject to supervision and modification by the Court. [ ]

Included in the Court's Order is a short period of supervised visitation between Mrs. Meyr and the children using the services of the children's karate teacher, James Sherman, as a supervisor. After that period expires, the Court will order that Mrs. Meyr have unsupervised visitation at least one day per week for at least three hours, with the time to increase as the Best Interest Attorney follows the recommendation of the family therapist. The court will order that Mr. Meyr shall pay for the cost and fees incurred by the Best Interest Attorney and all of the costs for the family therapy. The more quickly the reunification is complete, the sooner Mr. Meyr can be free from what the Court recognizes is a substantial, but hopes temporary, burden.

Lastly, Mrs. Meyr will need assistance in providing conditions in which the children can visit without supervision. She has been deprived of the opportunity to take joy in rearing her children over the years, but especially since the separation. The Court orders regarding custody, visitation, and therapy seek to help her as well as the children unify and establish normal relations. In addition, she will also need assistance in becoming wholly self-supporting. She now has limited education and skills suitable for the economic conditions [in which] she finds herself after voluntarily leaving the marriage. She will need substantial time to acquire education or training to achieve a living standard equal to that which she had during a 13–year marriage.

Her relatively young age today should allow her time to do so.

Although Ronald Meyr offered testimony and exhibits to show a decreased level of income, the precipitous drop from almost $100,000 per year in 2006 and 2007 to slightly over $30,000 per year was not convincing at all. He has not changed his standard of living over the years, receives housing and childcare as a bookkeeping item from his mother, and has a job that currently keeps him too busy to attend the therapy sessions with Ms. Browne.

Mrs. Meyr will need a great deal of time to achieve skills to allow her to acquire her previous lifestyle and become self-supporting. She currently cannot earn more than a bare minimum wage. Her thirteen years of marriage under conditions that led to her leaving the household support her right to have assistance from her former husband. Although Mr. Meyr is 57, and Mrs. Meyr is only 38. [sic] Mr. Meyr is maintaining a consistent lifestyle and has savings and a major share in a money-making enterprise that has, in the recent past, paid him $100,000 per year. He can well afford to assist Mrs. Meyr without suffering a decrease in his standard of living and provide their children his share of support. . . .

The court issued a series of orders on February 1, 2010. It issued a Judgment of Limited Divorce, awarding rehabilitative alimony of $650 per month for four years, and at the conclusion of that time, permanent alimony in the amount of $300 per month. The court issued an Order Regarding Custody and Visitation, which awarded primary physical custody to Mr. Meyr, with visitation for Ms. Meyr, and ordered that the parties have shared legal custody. The order further provided:

ORDERED, that the children's best interests attorney, Jean Meta, Esquire, shall remain appointed to coordinate the children's reunification therapy with Mother, for as long as she deems said therapy is needed by the family, or until she petitions to the Court to be relieved for said duties; and it is

ORDERED, that Jean Meta, Esquire, is vested with the power to direct family reunification therapy, including but not limited to the power to choose alternate therapists or care providers as necessary; and it is

ORDERED, that Jean Meta, Esquire, is vested with the power to modify Mother's access schedule upon consultation with the family's care providers, as therapy progresses and she deems appropriate; and it is

ORDERED, that Mother shall have supervised periods of access with the minor children, with access to [the twins] every other week, and access to [the older daughter] on the alternating week, until Mother has had four (4) visits with each child, or until March 22, 2010, whichever occurs first; [5] and it is

ORDERED, that Mother's supervised period of access shall be supervised by James P. Sherman, or, in the event he is unavailable, another individual mutually agreed upon in writing by the parties; and it is

ORDERED, that upon Mother's having four (4) visits with each child or the coming of March 22, 2010, Mother shall have unsupervised visitation with each child (but not necessarily all three children at the same time) *at least* once per week for 3 hours, with the hope and expectation that such time will increase as family therapy progresses; and it is

ORDERED, that in addition to the weekly periods of supervised or unsupervised visitation, Mother shall be entitled to

---

5. The order providing visitation with the children on different days likely was based on the testimony of Cynthia Browne, who provided family reunification therapy to the Meyr family, and who was certified as an expert in evaluating and treating families in therapeutic visitation settings. Ms. Browne described the relationship the Meyr children had with their mother and the dynamics in the relationship among the children, noting that the twins adopted the older daughter's behavior. She stated that the twins

"were probably more able to initiate or become a part of a relationship with their mom, so I felt that it would be good for [Ms. Meyr] to start with [the twins] on the weekends, and that [the older daughter] who seems to almost be the arm of the grandmother ... should be seen separately, so that the twins would have more of a chance to just be themselves with their mom."

travel to the Kent Island Martial Arts Center (KMAC) located at 222 Shopping Center Road, Stevensville, Maryland 21666 (or any other address to which said establishment might relocate), to see the minor children in their martial arts classes whenever convenient and provided that Mother or her attorney of record gives Father or his attorney of record written notice at least forty-eight (48) hours prior to the intended visit; and it is

\* \* \*

ORDERED, that Father shall pay all costs and fees associated with the children's best interest attorney, Jean Meta, Esquire; and it is

ORDERED, that Father shall pay all costs and fees associated with reunification, family, and children's therapy not otherwise covered by insurance, including but not limited to the expenses associated with Dr. Catherine Smithmyer and Cynthia Browne, LCSW–C . . . .

On February 16, 2010, Ms. Meyr filed a Motion to Alter or Amend Judgment. She alleged, among other things, that the court "cannot delegate the authority to make custody determinations to a third party." Ms. Meta, the best interest attorney, filed a response to Ms. Meyr's motion, agreeing that the court could not delegate to her the discretion to make decisions regarding the visitation schedule.

On February 22, 2010, Mr. Meyr moved to dismiss the motion, arguing that it was untimely. On February 23, 2010, Mr. Meyr filed a Notice of Appeal from the court's February 2010 orders.

On March 2, 2010, Ms. Meyr filed a Motion for Suit Money for Appeal. She asserted that she received representation at trial pro bono, that her attorney would not be able to represent her without compensation on appeal, and that she did not have sufficient funds to pay counsel for services rendered during appeal proceedings.

On March 15, 2010, Mr. Meyr filed an Answer to Motion for Suit Money, claiming that Ms. Meyr had sufficient funds to

afford the legal fees associated with an appeal because "she has a full-time job and has savings in her bank account." Mr. Meyr asserted that he did not have sufficient assets to pay Ms. Meyr's legal fees associated with the appeal, stating that he was already paying Ms. Meyr alimony and "all costs for the care of the children, which far exceeds his ability to support himself and his minor children and their needs."

On March 17, 2010, the court issued an Amended Order Regarding Custody and Visitation. The Amended Order included the terms of the initial order, with the exception that it deleted the provisions that the best interest attorney was vested with the power "to direct family reunification therapy" and to "modify Mother's access schedule upon consultation with the family's care providers, as therapy progresses and she deems appropriate." The March 17, 2010, Order included provisions from the February 5, 2010, Order relating to Ms. Meyr's visitation schedule and Ms. Meta's fees. It also changed the date on which Ms. Meyr was to begin unsupervised visitation, moving it from March 22, 2010 to April 24, 2010. On April 12, 2010, Mr. Meyr filed a second Notice of Appeal.

On April 19, 2010, the court issued an order in response to Ms. Meyr's request that Mr. Meyr pay her attorney's fees to defend his appeal. The order provided:

> ORDERED, that [Ms. Meyr] is awarded reasonable and necessary suit money in the amount of $6,000, to be paid by [Mr. Meyr] to [Ms. Meyr] within 60 days of the docketing of this order.

Mr. Meyr filed another appeal from this order.

On June 15, 2010, Mr. Meyr filed a motion in this Court to consolidate the appeals. The motion was granted on August 4, 2010.

## STANDARD OF REVIEW

In reviewing an action that has been tried without a jury, "the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the

trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c). " 'If there is any competent evidence to support the factual findings below, those findings cannot be held to be clearly erroneous.' " *Friedman v. Hannan*, 412 Md. 328, 335–36, 987 A.2d 60 (2010) (quoting *Solomon v. Solomon*, 383 Md. 176, 202, 857 A.2d 1109 (2004)).

The clearly erroneous standard does not apply to legal conclusions. *Karsenty v. Schoukroun*, 406 Md. 469, 502, 959 A.2d 1147 (2008). "Where a case involves 'the application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are "legally correct" under a *de novo* standard of review.' " *Clancy v. King*, 405 Md. 541, 554, 954 A.2d 1092 (2008) (quoting *Walter v. Gunter*, 367 Md. 386, 392, 788 A.2d 609 (2002)).

## DISCUSSION

### I.

### Best Interest Attorney

Mr. Meyr contends that "the trial court exceeded its authority when it delegated to the best interest attorney the decision of how long family reunification therapy is to continue." Noting that Maryland law charges trial judges with the authority to make decisions regarding visitation upon a determination of the children's best interest, Mr. Meyr argues that such "discretion must be exercised by a court, not some other individual." He contends that, in this case, "the Best Interest Attorney appointed by the trial court has been ceded the authority to determine for how long psychological therapy is needed by the family; this therapy is an adjunct of [Ms. Meyr's] visitation" and that "delegation is not permitted by law." Mr. Meyr argues that "[t]he trial court should be directed to amend its order so that either party, or the Best Interest Attorney, may petition the court for termination of

therapy, and for the release of the Best Interest Attorney from further obligation in the case."

Ms. Meyr contends that the trial court did not grant the best interest attorney exclusive authority to "determine either when visitation would occur or resume or how long therapy would continue." Rather, Ms. Meyr argues, the plain language of the Order merely gives the Best Interest Attorney the authority "to coordinate the therapy already in place until either she feels her assistance is not required or until the court appoints another attorney." [6]

■■■■ The question whether a court has improperly delegated judicial authority to a non-judicial person is an issue of law subject to *de novo* review. *In re Mark M.*, 365 Md. 687, 704–05, 782 A.2d 332 (2001); *In re Caya B.*, 153 Md.App. 63, 81, 834 A.2d 997 (2003). The cases are clear, and the parties agree, that a court may not delegate to other individuals decisions regarding child visitation and custody. *See In re Mark M.*, 365 Md. at 704, 782 A.2d 332 ("[A] trial court may not delegate judicial authority to determine the visitation rights of parents to a non-judicial agency or person."); *Shapiro v. Shapiro*, 54 Md.App. 477, 484, 458 A.2d 1257 (1983) ("Jurisdiction over custody and visitation . . . of children is vested in the equity courts. There is no authority for the delegation of any portion of such jurisdiction to someone outside the court.") (citation omitted). The parties disagree, however, as to the scope of the court's order in this case.

When the court issued its initial Order Regarding Custody and Visitation, it ruled as follows regarding the best interest attorney's authority:

> ORDERED, that the children's best interest attorney, Jean Meta, Esquire, shall remain appointed to coordinate the children's reunification therapy with Mother, for as long as she deems said therapy is needed by the family, or until she

---

**6.** The children's best interest attorney, Ms. Meta, also submitted a brief. On the first two issues, she adopted the arguments made by Ms. Meyr.

petitions to the Court to be relieved for said duties; and it is

ORDERED, that Jean Meta, Esquire, is vested with the power to direct family reunification therapy, including but not limited to the power to choose alternate therapists or care providers as necessary; and it is

ORDERED, that Jean Meta, Esquire, is vested with the power to modify Mother's access schedule upon consultation with the family's care providers, as therapy progresses and she deems appropriate. . . .

The court's Memorandum Opinion and Judgment of Limited Divorce explained Ms. Meta's authority as follows:

The court is also ordering the children's best interest attorney, Jean Meta, Esquire, to oversee the children's therapy. As such, the Court is vesting with her the power to direct family reunification therapy subject to supervision and modification by the Court. Lastly, the Court is assigning the best interest attorney the authority to modify Mrs. Meyr's access schedule as the family therapy progresses.

Upon motions filed by Ms. Meyr and Ms. Meta, noting that the court could not delegate to Ms. Meta the authority to make decisions regarding the visitation schedule, the circuit court amended its order. The court deleted the parts of the order that permitted Ms. Meta to "direct family reunification therapy" and to modify Ms. Meyr's visitation schedule. The amended order retained the following provision:

ORDERED, that the children's best interests attorney, Jean Meta, Esquire, shall remain appointed to coordinate the children's reunification therapy with Mother, for as long as she deems said therapy is needed by the family, or until she petitions the Court to be relieved of said duties. . . .

Mr. Meyr challenges this portion of the order, addressing Ms. Meta's authority to oversee family reunification therapy. He argues that this order delegated to Ms. Meta the responsibility of determining how long family reunification therapy should continue. We agree, to an extent. The order gives Ms. Meta authority "to coordinate the children's reunification

therapy ... for as long as she deems said therapy is needed." The court made clear in its memorandum opinion, however, that this authority to oversee therapy is "subject to supervision and modification by" the court.

The question in this case is whether delegation of authority to oversee family therapy, a matter ancillary to child custody, is permissible. None of the parties have cited any Maryland law directly on point.

We find *Yates v. Yates*, 963 A.2d 535 (Pa.Super.Ct.2008), to be instructive in this regard. In that case, the Superior Court of Pennsylvania rejected the argument that the appointment of a parenting coordinator constituted an improper delegation of judicial decision-making authority. *Id.* at 540.[7] The trial court had resolved the primary issues relating to legal custody, physical custody, and visitation. *Id.* The parenting coordinator was empowered merely to resolve "ancillary" custody disputes, such as "determining temporary variances in the custody schedule, exchanging information and communication, and coordinating [the daughter's] recreational and extracurricular activities." *Id.* The appellate court held that, because the trial court had "resolved the central custody issues and retained judicial review over the parenting coordinator's decisions concerning the ancillary issues," there was not an improper delegation of judicial decision-making authority to the parenting coordinator. *Id.* at 541.[8] The court noted that, "if

---

**7.** The court explained "parenting coordination" as follows:

a child-focused alternative dispute resolution process in which a mental health or legal professional with mediation training and experience assists high conflict parents to implement their parenting plan by facilitating the resolution of their disputes in a timely manner, educating parents about children's needs, and with prior approval of the parties and/or the court, making decisions within the scope of the court order or appointment contract.

*Yates v. Yates*, 963 A.2d 535, 539 (Pa.Super.Ct.2008) (quoting Stephen J. Anderer, *Resolving High-conflict Custody Cases, Parenting Coordinators Can Offer a Way Out of Repeated Recourse to Court*, 31 PLW 1074, 1082 (2008)).

**8.** The Court of Appeals Standing Committee on Rules of Practice and Procedure (the "Rules Committee") presently is considering a proposed rule regarding parent coordinators.

the parties are dissatisfied with the parenting coordinator's decision, they can appeal it to the trial court," which would review the contested decision *de novo. Id.*

Similarly, here, the order was not an improper delegation of judicial decision-making power. The trial court resolved the primary issues relating to custody and visitation, and its delegation of authority to Ms. Meta involved merely the coordination of family reunification therapy, a matter ancillary to custody and visitation. The trial court expressly stated that Ms. Meta's authority to oversee the therapy was "subject to supervision and modification by" the court.

Mr. Meyr has cited to no authority that would prevent him from petitioning the court to terminate therapy or release the best interest attorney. There is no need, as Mr. Meyr requests, to direct the circuit court to amend its order to reflect this option. For the reasons stated, we find Mr. Meyr's claim of error in this regard to be without merit.

## II.

### Visitation Plan

Mr. Meyr next contends that "the trial court failed to exercise its discretion properly" in its visitation order. He argues that Maryland law requires the trial court to establish access times when parents cannot agree on a visitation schedule, asserting that the trial court should have "set a regular day and time for the weekly visitation, and let the parties determine the day and time of any additional visitation as provided for in the Amended Order."

Ms. Meyr contends that the failure to set a definite visitation schedule was not an abuse of discretion. Although acknowledging that there is a preference under Maryland law for the trial court to establish a definitive visitation schedule when the parties cannot do so on their own, Ms. Meyr argues that the establishment of a regular schedule is not required. She contends that the trial court did not abuse its discretion in

ordering visitation comparable to that agreed to by the parties.[9]

"Decisions concerning visitation generally are within the sound discretion of the trial court [ ] and are not to be disturbed unless there has been a clear abuse of discretion." *In re Billy W.*, 387 Md. 405, 447, 875 A.2d 734 (2005). "There is an abuse of discretion 'where no reasonable person would take the view adopted by the [trial] court' . . . or when the court acts 'without reference to any guiding rules or principles.'" *In re Caya B.*, 153 Md.App. at 74, 834 A.2d 997 (quoting *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312, 701 A.2d 110 (1997)).

Although "a definitive visitation schedule is preferable where parties are unable to structure their own[,]" "the best interests of the children are better served by a structure . . . that permits flexibility if the parents are able to handle it." *Leary v. Leary*, 97 Md.App. 26, 54, 627 A.2d 30 (1993). To that effect, the Court of Appeals has stated:

> [T]here is a great deal of flexibility permitted in visitation orders. They run a gamut—a proper gamut. In the divorce, or post-divorce, setting, they may simply provide for "reasonable," but otherwise unspecified, visitation, or they may set out a rather detailed schedule with respect to times, places, and conditions, or they may be somewhere between those poles, depending on the circumstances and the ability of the parties to agree to a mutually acceptable arrangement.

*In re Justin D.*, 357 Md. 431, 447, 745 A.2d 408 (2000).

We find Mr. Meyr's claim that the trial court abused its discretion in issuing the visitation schedule to be without merit. On January 20, 2010, the best interest attorney read into the record an interim visitation schedule agreed to by the parties that would be in effect until the trial court issued its final order. It provided:

---

9. Ms. Meyr refers to the agreement between the parties regarding visitation "in the interim," pending further order of the court.

The parties have agreed that [the children's karate instructor], who testified here yesterday, we're going to coordinate with him so that he would provide supervised access for Ms. Meyr. We're hoping that that can be achieved not less than one time per week. And it will be alternating, again pending further order of the Court, [the twins] one week and [the older daughter] on the other. And obviously, we're going to have to coordinate with his schedule, the hours that he's available, and I think everybody's [sic] willing to defer to whatever accommodates him, since he's doing them this favor.

Mrs. Meyr will be able to supplement those visits, pending further order of the Court, by visiting the Kent Island Martial Arts School whenever is convenient, and provided she gives written notice within forty-eight hours. And the way that we decided that was going to work is that she will notify her attorney. Mr. Sewell will then send an e-mail to both Ms. Knight and I advising us that Ms. Meyr intends to exercise some time with the children at the school. So, the lawyers are going to communicate to coordinate that, and that's the agreement pending further order of the Court.

The court's February 1, 2010, Order Regarding Custody and Visitation, and the March 26, 2010, Amended Order Regarding Custody and Visitation, incorporated the visitation schedule agreed to by the parties on January 20, 2010. Under these circumstances, and where the parties never proposed a specific visitation schedule, we find that the trial court did not abuse its discretion in its order regarding visitation.

### III.

### Attorneys' Fees

Mr. Meyr's final contention is that "the trial court abused its discretion when it ordered appellant to pay for all of the services of the best interest attorney and to pay advanced appellate attorney's fees to appellee." Although acknowledging that a trial court has authority to award attorney's fees to one party, he argues that the trial court erred in this case

because it made the award without assessing "the 'financial status of each party, the needs of each party, and whether there was substantial justification for bringing, maintaining or defending the proceedings,'" as required by Md.Code (2006 Repl.Vol.), § 12–103(b) of the Family Law Article ("F.L."). Mr. Meyr asserts that the trial court "made no finding as to the parties' income and expenses," and he argues that the court "err[ed] and/or abused its discretion" in ordering him "to pay all attorney's fees for the best interest attorney and requir[ing] him to advance $6,000 for [Ms. Meyr's] appellate attorney's fees, without any analysis of his ability to pay for these expenses."

Ms. Meyr contends that the trial court made the requisite findings to award attorneys fees. Ms. Meta "adopts, and incorporates by reference, the arguments made by [Ms. Meyr] relative to the appropriateness of the trial court's analysis of the financial circumstances of the parties." With respect to her fees, however, she contends that the court's ruling requiring payment of her fees was premature because she has not yet filed a petition for fees.

## A. Standard of Review

The award of counsel fees is reviewed under the abuse of discretion standard. *Harbom v. Harbom,* 134 Md. App. 430, 460, 760 A.2d 272 (2000). A circuit court's decision in this regard "will not be reversed unless a court's discretion was exercised arbitrarily or the judgment was clearly wrong." *Petrini v. Petrini,* 336 Md. 453, 468, 648 A.2d 1016 (1994).

## B. Attorney's Fees for Appeal

Although the general rule is that "each party is responsible for its own legal fees," a court may order one party to pay the other party's attorney's fees pursuant to statute or by an express agreement. *Henriquez v. Henriquez,* 413 Md. 287, 294, 992 A.2d 446 (2010). Mr. Meyr does not dispute the statutory authority permitting an award of attorney's fees in cases involving child custody. F.L. § 12–103

provides that the court may award counsel fees subject to the following considerations:

(b) *Required considerations.*—Before a court may award costs and counsel fees under this section, the court shall consider:

(1) the financial status of each party;

(2) the needs of each party; and

(3) whether there was substantial justification for bringing, maintaining, or defending the proceeding.

(c) *Absence of substantial justification.*—Upon a finding by the court that there was an absence of substantial justification of a party for prosecuting or defending the proceeding, and absent a finding by the court of good cause to the contrary, the court shall award to the other party costs and counsel fees.[10]

Mr. Meyr contends that the trial court failed to consider the requisite factors, specifically the financial status and needs of each party.[11] Our review of the record indicates to the contrary. Although the court did not specifically recite the statutory factors in its award of attorney's fees, the court's earlier statements show that it had considered these factors with respect to its other rulings.

The trial court provided the parties with a thorough memorandum opinion explaining its factual findings regarding the parties' financial needs and resources. Although the order awarding Ms. Meyr appellate attorney's fees did not specifically address the parties' financial needs and resources, the trial court's findings in its Memorandum Opinion and Judgment of Limited Divorce, which was issued approximately two-and-a-

---

**10.** Similarly, Md.Code (2006 Repl.Vol.), § 7–107(b)–(c) of the Family Law Article provides that the court may award attorney's fees in an action for divorce, after a consideration of: "(1) the financial resources and financial needs of both parties; and (2) whether there was substantial justification for prosecuting or defending the proceeding."

**11.** At oral argument, counsel for Mr. Meyr stated that she was not arguing that Ms. Meyr did not have a substantial justification for responding to Mr. Meyr's appeal.

half months before the order awarding attorney's fees, demonstrated that the court had engaged in the requisite analysis. In awarding Ms. Meyr alimony under F.L. § 11–110, the trial court made specific findings with respect to the parties' income and earning potential, the financial needs of the parties, and the causes of the Meyr family's discord. The trial court found that Ms. Meyr earned minimum wage working at a convenience store, did not have a car, and lived in a rented room. Mr. Meyr, on the other hand, had maintained a lifestyle consistent with his pre-divorce lifestyle, and he owned "a major share in a money-making enterprise that ha[d], in the recent past, paid him $100,000 per year." The court found that his claimed expenses of rent and childcare payments to his mother were a mere "bookkeeping item," and that Mr. Meyr "can well afford to assist [Ms.] Meyr without suffering a decrease in his standard of living."

The court set forth its findings regarding the parties' financial situation and needs in its initial memorandum opinion, and we find no error in the failure to reiterate them in the order regarding attorney's fees. The court's findings were sufficient to support the court's award to Ms. Meyr of counsel fees on appeal.

### C. Best Interest Attorney's Fees

As stated above, Mr. Meyr contends that the court abused its discretion in ordering him to pay the best interest attorney's fees because it did not first conduct the appropriate analysis of his financial resources and financial needs. Ms. Meta disputes this assertion, but she contends that, because she has not yet submitted her fees for payment, the court's award of her fees was premature. She argues that "the determination as to who should pay the fees for child's counsel should more appropriately be done at such time as a petition for fees has been filed."

The court order appointing Ms. Meta as the children's attorney included a fee provision. It provided:

The Defendant is each [sic] hereby directed to pay the appointed attorney for deposit into the attorney's trust

account the sum of $750.00 **on or before August 10, 2009** as initial contributions toward the attorney's fee in performing these services. The attorney shall not provide services with a value in excess of $3,000 without first reporting the same to the Court. The Attorney shall not charge a fee which exceeds $150.00 per hour. A final allocation of fees will be determined by the Court at a hearing on the merits of the case, or upon motion of child's counsel.

The Amended Order Regarding Custody and Visitation provided:

ORDERED, that father shall pay all costs and fees associated with the children's best interest attorney, Jean Meta, Esquire. . . .

A court order providing that one of the parties involved in a custody dispute pay counsel fees to a best interest attorney is clearly authorized by statute. F.L. § 1–202 provides, in pertinent part:

(a) *In general.*—In an action in which custody, visitation rights, or the amount of support of a minor child is contested, the court may:

(1)(i) appoint a lawyer who shall serve as a child advocate attorney to represent the minor child and who may not represent any party to the action; or

(ii) appoint a lawyer who shall serve as a best interest attorney to represent the minor child and who may not represent any party to the action; and

(2) impose counsel fees against one or more parties to the action.

This statute, unlike F.L. § 12–103(b), addressing attorney's fees in child custody cases, does not set forth the specific factors that a court should consider in awarding counsel fees for a best interest attorney. The Court of Appeals has indicated, however, that the factors set forth in F.L. § 12–103(b), are relevant to the analysis. *See Taylor v. Mandel,* 402 Md. 109, 134, 935 A.2d 671 (2007) ("[W]henever a court assesses guardian ad litem fees under Section 1–202, the court

should consider various factors, such as those articulated in Section 12–103(b) of the Family Law Article.").

Mr. Meyr argues that the court failed to consider the requisite factors before ordering him to pay Ms. Meta's attorney's fees. As we explained, *supra,* the trial court engaged in a thorough consideration of the parties' financial needs and financial status, and it recognized that Mr. Meyr was in the best position to pay the fees.

The court also noted that Mr. Meyr bore much of the responsibility for bringing about the conditions necessitating Ms. Meta's services, and that Mr. Meyr's behavior would, in large part, determine how long he would be responsible for the expenses. The court stated in its memorandum opinion:

> Repairing the existing bad relations of the children and their mother, and reestablishing normal and proper relations, may progress slowly and with difficulty. The Court believes that much depends on the goodwill of Mr. Meyr, his brother, and his mother, even though undoubtedly, they will disagree and may want to resist. Nevertheless, their sincere cooperation will certainly shorten and simplify the process. The Court periodically will have to continue to monitor and to evaluate the children's progress toward establishing proper healthy relations with their mother, as well as their father. The custody, support, and alimony orders in this case are designed with therapy to renovate the parental relationships and to cure the harm that Mr. Meyr and others have thus far caused to the normal and healthy mother/daughter relationships.

> The Court thoroughly appreciates the difficulty of the task that confronts all those involved in this family. As stated above, reunification may take a great deal of time and will incur substantial expense. The Court concludes, however, that the responsibility for the state of affairs falls entirely on Mr. Meyr and he should bear the entire liability for paying for the repair. Mrs. Meyr is not today in financial condition to pay any part at all.

We find no abuse of discretion in the court's order allocating to Mr. Meyr the costs of the best interest attorney in coordinating the family reunification therapy.

The best interest attorney contends, however, that it was premature for the court to order Mr. Meyr to pay her fees because she has not yet submitted a bill for fees. We agree. A request for attorney's fees generally requires proof of the reasonableness of the fee. *See Rauch v. McCall,* 134 Md.App. 624, 638, 761 A.2d 76 (2000). After Ms. Meta submits her bill for fees, and after Mr. Meyr has had an opportunity to raise any challenge to the reasonableness of the request, the court can issue an order for the payment of the attorney's fees.

**JUDGMENT ORDERING MR. MEYR TO PAY THE FEES FOR THE BEST INTEREST ATTORNEY REVERSED. JUDGMENT OTHERWISE AFFIRMED. COSTS TO BE PAID BY APPELLANT.**