47 A.3d 1018

Victoria GILLESPIE

v.

David GILLESPIE.

Nos. 960, 2153, Sept. Term, 2011.

Court of Special Appeals of Maryland.

June 29, 2012.

148

150

Joel Marc Abramson (Abramson & Rand, LLC, on the brief), Columbia, MD, for Appellant.

Scott M. Strickler (Geoffrey S. Platnick, Shulman, Rogers, Gandal, Pordy & Ecker, PA, on the brief), Potomac, MD, for Appellee.

Panel: KEHOE, BERGER, RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

BERGER, J.

This case arises from an Order of the Circuit Court for Frederick County modifying custody of the children of the parties. On August 24, 2009, Victoria Gillespie ("Mother") and

David Gillespie ("Father") signed a voluntary separation and property settlement agreement, agreeing to joint physical and legal custody of their three minor children.[1] The separation agreement provided that the children were to alternate weeks between Mother and Father, spending fifty percent of their time with each parent. A hearing was held on September 11, 2009, and the parties were granted an absolute divorce on October 5, 2009, incorporating the terms of the separation agreement.

On June 9, 2010, Father filed a motion to modify custody. The custody modification trial took place on April 19, 20, and 22, 2011. The circuit court rendered its opinion from the bench at the conclusion of trial and subsequently issued a written order on May 5, 2011. The order modified the physical access of the children, granting significantly more access to Father than Mother. The court also modified legal custody granting Father tie-breaking authority in the event of an impasse. Mother filed motions to alter and amend and for a new trial, which the circuit court denied on June 13, 2011. This timely appeal followed.

---

1. "Physical custody ... means the right and obligation to provide a home for the child and to make the day-to-day decisions required during the time the child is actually with the parent having such custody." *Taylor v. Taylor*, 306 Md. 290, 296, 508 A.2d 964 (1986). "Legal custody carries with it the right and obligation to make long range decisions involving education, religious training, discipline, medical care, and other matters of major significance concerning the child's life and welfare." *Id.*

"Joint legal custody means that both parents have an equal voice in making those decisions and neither parent's rights are superior to the other." *Taylor, supra*, 306 Md. at 296, 508 A.2d 964. "Joint physical custody is in reality 'shared' or 'divided' custody. Shared physical custody may, but need not, be on a 50/50 basis." *Id.* at 296–97, 508 A.2d 964. "The parent not granted legal custody will, under ordinary circumstances, retain authority to make necessary day-to-day decisions concerning the child's welfare during the time the child is in that parent's physical custody. Thus, a parent exercising physical custody over a child ... necessarily possesses the authority to control and discipline the child during the period of physical custody." *Id.* at 296 n. 4, 508 A.2d 964.

■ Father filed an appeal from the circuit court's orders requiring him to pay outstanding fees owed to the court appointed evaluator, Rebecca L. Snyder, Psy.D ("Dr. Snyder"), and the children's best interest attorney, Richard M. Winters ("Winters").[2] This Court elected to treat Father's appeal as a cross-appeal.

On appeal, Mother presents two issues for our review, which we have rephrased as follows:

I. Whether the circuit court erred in admitting the report of R. Allen Lish, Psy.D ("Lish Report").

II. Whether the circuit court erred in modifying custody of Mother and Father's three minor children.

Father presents one issue for our review, which we have rephrased as follows:

I. Whether the circuit court erred in ordering Father to pay the balance due to the best interest attorney and the court appointed evaluator.

For the reasons set forth below, we affirm the judgment of the Circuit Court for Frederick County modifying custody. Because we conclude that the circuit court erred in ordering

---

**2.** Father's motions to reconsider, alter, or amend were denied on July 25, 2011. On August 24, 2011, Father filed his notice of appeal of the orders requiring payment of best interest attorney's and court appointed evaluator's fees. Mother filed a motion to dismiss Father's appeal as untimely. Mother argues that judgment was not yet final at that time because the circuit court did not rule on her motion for attorney's fees until November 4, 2011, and therefore, Father was required to file a notice of appeal after the November 4, 2011 final disposition.

We are not persuaded by Mother's argument. Although a ruling of a circuit court is not appealable until it constitutes a final judgment, this rule does not apply to orders that are collateral to the proceeding. *Rohrbeck v. Rohrbeck*, 318 Md. 28, 41, 566 A.2d 767 (1989). Motions for the payment of fees are collateral to the merits. *Blake v. Blake*, 341 Md. 326, 338, 670 A.2d 472 (1996) ("[A] decision on the merits is a 'final decision' ... whether or not there remains for adjudication a request for attorney's fees attributable to the case."). Father's motions to reconsider, alter, or amend the orders requiring him to pay best interest attorney's and court appointed evaluator's fees were denied on July 25, 2011, and his notice of appeal was filed on August 24, 2011. Accordingly, we find that Father's appeal was timely under Maryland Rule 8–202 and deny Mother's motion to dismiss.

Father to pay the balance due to the best interest attorney and the court appointed evaluator, we vacate that order and remand for the limited purpose of determining the fees for the best interest attorney and court appointed evaluator in accordance with the statute.

## FACTUAL AND PROCEDURAL BACKGROUND

Father and Mother were married on August 28, 1993. They have three minor children: a son, age eleven, a daughter, age nine, and a daughter, age seven. The parties entered into a Voluntary Separation and Property Settlement Agreement ("Agreement") on August 24, 2009. At that time, the parties and the three children resided together at the marital home. The Agreement specified that the parties would separate on September 13, 2009, and the parties separated on September 12 and 13, 2009. The Agreement provided for joint legal and physical custody with the children alternating between the parents on a weekly basis. The Agreement also provided a holiday schedule for the children.

Mother and Father were divorced on October 5, 2009, following a hearing before a Family Law Master on September 11, 2009. The Agreement was incorporated but not merged into the Judgment for Divorce, and the court granted the parties joint legal and shared physical custody. Following the divorce hearing, during the weekend of September 12, 2009, Mother moved out of the marital home and initially moved into the home of her sister, Lisa Adkins ("Adkins"). Mother intended to remain at Adkins' home until the construction of her new home was completed. The parties initially followed the alternate week schedule, but there were soon deviations from the schedule. At various times throughout the fall of 2009, Mother asked Father to keep the children additional nights or delay drop-off or pick-up for various reasons, including Mother's work obligations and because Mother did not want the children to be around Adkins' boyfriend.

The parties agreed to temporarily postpone the alternating weeks schedule in February 2010 because Adkins' boyfriend was planning to move in and Mother did not want to expose the children to him. From February through April 2010, the children lived predominantly with Father. The children did not stay overnight with Mother at Adkins' home, but Mother spent time with the children regularly during the week and on weekends. At the end of April 2010, the parties agreed that the girls would resume alternate weeks while their son would continue to reside primarily with Father. Mother believed that the alternate weeks would resume for all three children once she moved into her own house.

Since the divorce, there has been increasing volatility in the relationship between Mother and the parties' son. Both parties agree that the son has been increasingly disrespectful to Mother since the divorce. One evening in February 2010, at approximately 11:20 p.m., Mother telephoned Father and told him to "get [the son]'s ass out of [her] house" and said that the son needed to stay with his father until he could act respectfully toward her. Mother claimed that she believed the son was sleeping when she made this statement, but she since learned that the son had heard her comments. Father testified that the son was extremely upset by his mother's statement and that the son felt that his mother did not want him in her home. Mother testified that she and the son have had difficulty getting along at times but that she has made efforts to improve her relationship with the son.

On May 25, 2010, Mother moved out of Adkins' home and into her new home but the alternating weeks schedule did not resume. The girls spent the week of May 28, 2010 with Mother pursuant to the separation agreement but the son did not. Father filed a motion to modify custody on June 9, 2010. The following alternate week, the week of June 11, 2010, the girls again came to Mother's home but the parties' son did not. Mother complained about Father's refusal to allow her access to the son. She called and emailed Father to remind him of his breach of the Agreement. The following alternate week, the week of June 25, 2010, the girls again came to Mother's

home but the son remained with Father. At this point, Mother again notified Father that he was in breach of the Agreement and she filed a petition for contempt and show cause on June 25, 2010.[3]

All three children stayed with Mother for the entire week of July 9, 2010, and Mother testified that everything went well during that stay. All three children also spent the entire week with Mother during the weeks of July 23, 2010 and August 6, 2010. The son did not go to Mother's home for the week of August 20, 2010 and instead spent the week with Father and Mary Ann Grenis ("Grenis"), Father's girlfriend.[4] The following alternate week, September 3, 2010, all three children spent the week with Mother and Mother testified that the week went well. Throughout the fall of 2010, the son often did not spend time with Mother pursuant to the Agreement.

At the custody modification trial, the parties testified regarding various other events that occurred during the period between the parties' separation and divorce in the fall of 2009 and the custody modification trial in April 2011. On May 26, 2010, an altercation occurred between Mother and Grenis. Grenis had known the family for several years prior to Father and Mother's divorce. After the divorce, Father and Grenis began dating. On May 26, 2010, at a youth baseball game at the Mount Airy Youth Athletic Association ("MAYAA") baseball fields, Mother and Grenis had an argument relating to the time Grenis spent with the children. Mother struck Grenis in the face, and law enforcement personnel were called to the scene. Mother was charged with criminal assault and she ultimately pleaded guilty to second degree criminal assault. Mother was placed on unsupervised probation until January 2012. One of the conditions of probation was that she stay away from Grenis, but Grenis testified that Mother gave her

---

3. The parties later agreed to consolidate the contempt hearing with the hearing on the merits of the custody modification petition.

4. In the transcript, Grenis' last name is incorrectly spelled "Grenice."

"the finger" in view of the children in April 2011. Additionally, Mother was banned from the MAYAA baseball fields for one year.

Father further testified that Mother treats the son differently than the daughters and that Mother has made comments to the daughters such as, "[l]ook at [the son]. That is what a bad boy does." Father testified that in June 2010, Mother allowed the daughters to go on a beach vacation but did not allow the son, saying that he "didn't deserve to go." Both parties have admitted to giving "the finger" to each other in front of the children, and Father testified that on one occasion, Mother said, "fuck off, jackass" to him in the presence of the children. Father acknowledged that he did not put Mother's name or contact information on the YMCA after school program emergency contact card but instead left the section for "mother" blank.

There was also an incident on October 31, 2010. Father and Mother had a disagreement in front of the children regarding Younger Daughter's Halloween costume. Father testified that the son made a statement to which Mother replied, "You got a bad attitude. [sic] You can't stay here and you know, you just, you can just go back with your dad." Father testified that the son then got into his car and when they drove away, the son was in tears. The son's psychologist, Dr. Elise Abromson ("Dr. Abromson"), also testified that the son was very upset by this incident and that, after this event, the son no longer thought his relationship with his mother could be resolved.

Since Mother and Father's divorce, the parties' son has been in therapy with Dr. Abromson, a clinical psychologist. The son began seeing Dr. Abromson in October 2009 and Dr. Abromson continued to see him up to the point of the custody modification trial. Initially, the treatment goals were to help the son cope with his parents' divorce. Dr. Abromson testified that, at first, the son was extremely sad about the divorce. Despite the divorce, in the fall of 2009, Father and Mother got along exceptionally well and were willing to work together and

do whatever it took for the betterment of the children. Dr. Abromson testified that the parties now have much more tense interactions and significant difficulty communicating. Dr. Abromson testified that she believes the nature of the parents' relationship and their ability to communicate changed between October 2009 and the time of the custody modification trial in April 2011. Dr. Abromson further testified that she did not believe Father and Mother were able to effectively co-parent and that they would benefit from a parenting coordinator.

Dr. Abromson also testified at length regarding the parties' son's progress between 2009 and 2011. Dr. Abromson testified that the son was extremely upset when he heard his mother say that Father should "get [the son]'s ass out" of her house in February 2010. The son still regularly brought up the February 2010 incident in his interactions with Dr. Abromson, and in Dr. Abromson's opinion, the incident was still not fully resolved. Dr. Abromson testified that from spring 2010 through at least March 2011, the parties' son became less sad but increasingly frustrated and angry, and he often talked about the tension between his parents increasing. Dr. Abromson testified that the son felt out of control and that he viewed the litigation as a battle between the parents and that the son had allied himself with his father. Dr. Abromson had recommended to Father and Mother that the son needed some space from Mother in order to work on improving his relationship with her.

Sometime around September 2010, Dr. Abromson recommended that the parties' son gradually increase the time he spent with his mother, beginning with one night visits and then adding additional nights as he became more comfortable. At one point, Dr. Abromson believed the increased time was possibly moving too fast, but Mother wanted her son with her "fifty-fifty" and believed the schedule was working. Dr. Abromson testified that things between Mother and the parties' son were progressing well for a while in early fall 2010, but after the Halloween incident, the son no longer believed that the relationship could be improved.

Between November 2010 and the custody modification trial in April 2011, the parties' son spent more time with Father, but he also spent time with Mother. Dr. Abromson reported that the son's stress level increased during this period. In mid-March 2011, during a session with Dr. Abromson, the parties' son was "incredibly frustrated" and she had "never seem him that angry before." Dr. Abromson testified that the son's frustration then "moved over into just crying hysterically and saying that he felt that nobody cared about him" and that the son exhibited "a general sense of, of hopelessness." Dr. Abromson testified that this was the first time she had seen the parties' son cry since his first session when he was talking about the divorce. The son expressed to Dr. Abromson at that session that he did not want to go to Mother's house any more. Dr. Abromson testified that when she told Mother about the session, Mother reported that the son was doing well and she had not seen any of the emotions Dr. Abromson had seen during the session. Dr. Abromson testified that the son seemed happier and less stressed during the time he was staying exclusively at Father's home, and there was significantly more conflict when the son was staying with Mother. Additionally, although Dr. Abromson originally treated only the parties' son, she later began to see the parties' older daughter as well. The older daughter indicated that she did not like that her mother and brother were fighting frequently.

In addition to his motion to modify custody, on June 9, 2010, Father filed a motion for mental health evaluation of Mother, or, in the alternative, for family mental health and custody evaluation. Mother did not respond to the motion. Father filed a supplement to the motion on September 1, 2010, to which Mother filed a response on September 17, 2010. In his motion, Father had alleged that Mother had previously been diagnosed with bipolar disorder. In her response, Mother stated: "[Mother] has not been diagnosed with bi-polar disorder. As such, [Mother] does not know how [Father] arrived at such a contention."

Instead of ordering a mental health evaluation, the circuit court appointed Mr. Richard Winters ("Winters") to serve as

the children's best interest attorney on October 5, 2010. Winters filed a motion for psychological evaluation on March 1, 2011, and on March 18, 2011, the circuit court appointed Dr. Rebecca Snyder, Psy.D, ("Dr. Snyder") to prepare a psychological evaluation of each of the parties in order to measure "each party's personality strengths and weaknesses." The court ordered that Dr. Snyder have access to "all records, public or private, that bear upon the physical or mental health of either of the parties." Dr. Snyder did not complete a custody evaluation and she did not make any recommendations regarding custody and fitness of the parents. Dr. Snyder's report was admitted into evidence and she also testified at the custody modification trial.

The custody modification trial occurred on April 19, 20, and 22, 2011. The court heard from several witnesses, including Father, Mother, Grenis, Dr. Abromson, and Dr. Snyder, among others. Shortly before Dr. Snyder began her testimony on April 20, it came to the court's attention that she had just received the Lish Report. The Lish Report was prepared by Dr. R. Allen Lish ("Lish") pursuant to a voluntary evaluation in April 2009 and was entirely independent of any litigation. In that report, Dr. Lish diagnosed Mother with bipolar disorder.[5] Although Dr. Snyder was entitled to have access to all records, she did not receive the Lish report until immediately before trial. Mother had claimed that her current psychiatrist, Lisa R. Halpern, M.D. ("Dr. Halpern"), had the report, but when Winters subpoenaed Dr. Halpern's records, the Lish Report was not included. Personnel from Dr. Halpern's office indicated that they believed that they had returned the report to Mother, but she asserted that she did not have the report.

Additionally, Father had noted the deposition of Dr. Lish, and Dr. Lish was personally served on June 21, 2010. Mother

---

5. The Lish Report contradicted Mother's statement in her response to Father's motion for mental health evaluation, in which she had stated that she had never been diagnosed with bipolar disorder. Additionally, at trial, Mother testified that she had been diagnosed with bipolar disorder.

was provided with notice of the deposition and did not object. When counsel for Father arrived for Dr. Lish's deposition on August 13, 2010, Dr. Lish did not appear. Counsel for Father later learned that Dr. Lish had moved to North Carolina the day before the scheduled deposition and had taken all of his records with him. Counsel for Father asserted that he called Dr. Lish on multiple occasions but his calls were never returned. Dr. Snyder was ultimately able to locate Dr. Lish in North Carolina and received a copy of the report on the first day of trial. The court concluded that Dr. Snyder should have been provided with the Lish Report and that it was appropriate for her to review it. Dr. Snyder also had not previously been provided with notes from Dr. Halpern in which Dr. Halpern discussed the Lish Report. The court allowed Dr. Snyder to consider the notes from Dr. Halpern as well.

After Dr. Snyder reviewed the Lish Report and accompanying notes from Dr. Halpern, Winters moved to have the Lish Report and Halpern notes admitted into evidence. Mother objected to the admission of the Lish Report, arguing that the Lish Report was prejudicial and had not been produced until the day of trial. Counsel for Mother argued that although these documents formed a foundation for Dr. Snyder's opinions, so did various other medical records that were not being admitted into evidence. The court noted that the Lish Report and Halpern notes were the only records Dr. Snyder reviewed after completing her report. The court stated, "[A]fter [Dr. Snyder's] report was done she then reviewed other records including Dr. Lish and Dr. Halpern's. Now they were the only two that Mr. Winter [sic] moved." The court further stated that these documents differed from other documents that informed Dr. Snyder's opinion because "the report was done and these opinions [the Lish report and the Halpern notes] came in after her report was completed." Thereafter, the court admitted the Lish Report and the Halpern notes into evidence.

At trial, Dr. Snyder testified regarding the strengths and weaknesses of both parents. Dr. Snyder testified that both parents were very loving and emotionally invested in the

wellbeing of their children. Dr. Snyder testified that, during the marriage, the parties made considerable efforts to seek treatment for Mother's mental illness. Dr. Snyder also noted Mother's "minimization and a disowning of the significance of her mental health issues." Further, Dr. Snyder testified that Mother "really does have a personality style of preferring to minimize and not take sufficient ownership of her own role in problems in the family with her children and that . . . leads to trust issues and other concerns. . . ." Dr. Snyder testified that Father had involved the parties' son in the litigation, and although some knowledge of the litigation was inevitable, she thought that Father "at times failed to shelter [the son] sufficiently from [the litigation] and he needs work on being able to, to do that going forward."

Dr. Snyder testified that Father was typically not the initiating contributor to conflict, and that Father had "diligently tried for months . . . to continue to try to maintain the fifty–fifty access arrangement" and made "efforts toward having [the son] function within the agreement that the parties had reached." Rather, [Mother] was "more of the provocateur in conflict." Regarding Mother's strengths, Dr. Snyder testified that she is creative, warm-hearted, and spontaneous. Dr. Snyder noted, however, that the children, and particularly the son, have had difficulty with Mother's unpredictability and mood swings. When asked whether she believed Mother suffered from bipolar disorder or some form of personality disorder, Dr. Snyder stated that she was unable to conclusively make a diagnosis and that her evaluation was limited by Mother's "reticence to be forthcoming" during Dr. Snyder's evaluation. Dr. Snyder explained:

> I found support for the hypothesis that a mood issue, depression, and anxiety do impact [Mother's] ability to function. However the scope of what I did was not, I, I didn't feel I had the basis to make a diagnosis.
>
> * * *
>
> Particularly with [Mother's] reticence to be forthcoming. I'm troubled that I wasn't yet able to get from Dr. Hal-

pern's office sufficient records to have a diagnosis that, that Dr. Halpern is using to treat [Mother].

\* \* \*

I still don't have everything, Your Honor. I believe there have been at least a half dozen phone calls from my office to Dr. Halpern's office. In a way if, if there is indeed a mood, an Axis I, a biological component to [Mother's] issues, that's actually relatively easy to get medication for, to pursue cognitive behavioral therapy. We have evidence that there can be quite a, a great deal of success and [Mother] does report and it's reflected in Dr. Halpern's records that antidepressant medications have been helpful for [Mother] over the years. So that's actually an encouraging thing . . . I found traits of personality issues but I would not, you know, Dr. Lish diagnoses narcissistic personality disorder. I would not.

\* \* \*

I don't find the severity that Dr. Lish did of the issues. I think his description of many of the behaviors and concerns are, are similar and very accurately descriptive. . . . I didn't reach the same level of conclusion and in fact, Your Honor, the parties both reported to me even before I had Dr. Lish's report in hand, [Father] as well as [Mother] felt Dr. Lish, Lish's assessment was too, too severe in its conclusions.

\* \* \*

. . . Dr. Halpern's review of Dr. Lish's report . . . [discussed] its inaccurate and irrelevant erroneous assumptions. That was Dr. Halpern's assessment of Dr. Lish's report.

Dr. Snyder summarized her impressions, noting that both parties agreed that their conflict had "greatly impacted their kids." She emphasized that the parties "don't see solutions the same" and although the parents have similar goals for their children, they have very different parenting styles. Dr. Snyder testified that Mother would benefit from treatment by a therapist who was in communication with the children's therapist, and both parents would benefit from a parenting coordinator. She also testified that avoiding parent-to-parent

contact would be beneficial, given that conflicts often occurred when the children were transferred.

After three days of trial, the circuit court issued its ruling from the bench on April 22, 2011. The circuit court set forth, in significant detail, the witnesses who had testified, the evidence it had considered, and the court's findings of fact and conclusions. The court concluded that there was a material change in circumstances, stating:

> But why I believe there has been a change in circumstances is that some things have happened that indicate there's extreme deterioration of any mental condition that [Mother] suffers from. She's well-educated, she acted as a vice president, [of a bank]. Now who ever heard of the vice president of [a bank] slapping someone in the face at a baseball game? Just so out of character. What it indicates was essentially there was no control. I'm not even sure she really thinks she was wrong in doing that.

Having found a material change in circumstances, the court then stated it would consider the best interests of the children, noting the court "needs to take in the factors in determining the custody of the child to include but not be limited to the fitness of the parents, character and reputation of the parties, desire of the natural parents and agreements between them, potentiality in maintaining natural family relations, the preference of the child, material opportunities affecting the future life of the child, age, health, and sex of the child, residence of parents and opportunities for visitation, length of separation from the natural parents and prior voluntary abandonment and surrender." The court then discussed the factors and ultimately modified physical custody by placing the children in the primary care and custody of Father.[6] The court maintained joint legal custody but provided that, in the event of an

---

6. The order provided that the children would reside primarily with Father but would spend alternate weekends with Mother. On the weeks when Mother did not have the children over the weekend, the children would have an overnight visit with Mother on Thursday nights. The order also provided for a holiday rotation schedule.

impasse between the parties, Father would serve as the tie-breaker. The court issued its comprehensive ruling from the bench and subsequently issued a written order on May 5, 2011. Mother filed a motion for new trial and motion to alter or amend on May 16, 2011, which was denied on June 13, 2011. Mother noted her appeal on June 30, 2011.

On May 2, 2011, Winters filed petitions for fees for Dr. Snyder and for himself. Each party filed a response, and the circuit court granted Winters' petition, ordering Father to pay all of Dr. Snyder's and Winters' outstanding fees. Specifically, the court ordered Father to pay Dr. Snyder's fees in the amount of $3,669 and Winters' fees in the amount of $23,237.50. Father filed motions to reconsider, alter, or amend both orders requiring him to pay fees to Dr. Snyder and Winters, respectively, which were denied. On August 24, 2011, Father noted an appeal from the circuit court's denial of his motions with respect to the fees of Dr. Snyder and Mr. Winters. This Court elected to treat Father's appeal as a cross appeal.

## DISCUSSION

### I.

We first consider whether the circuit court erred in admitting the Lish Report into evidence and relying upon it in reaching its conclusions. Mother contends that the "Lish Report was the only evidence presented mentioning bi-polar disorder" and that the circuit court's opinion, which referred to Mother's bipolar disorder "clearly demonstrates that the [circuit court] considered the Lish Report for the truth of the matter asserted." For the reasons set forth below, we disagree.

### A. Standard of Review

We generally review rulings on the admissibility of evidence applying an abuse of discretion standard. *Bernadyn v. State*, 390 Md. 1, 7–8, 887 A.2d 602 (2005). Whether evidence is hearsay is an issue of law, and therefore we review

a hearsay determination *de novo*. *Id.* The circuit court may, at its discretion, admit inadmissible evidence relied upon by an expert for the limited purpose of evaluating the validity or probative value of an expert's opinion. *Brown v. Daniel Realty Co.*, 180 Md.App. 102, 118, 949 A.2d 6 (2008). Therefore, we apply an abuse of discretion standard when reviewing a circuit court's consideration of otherwise inadmissible evidence as the basis of an expert's opinion.

## B. The Lish Report

■■■ It is well established that experts may rely upon inadmissible evidence in formulating their opinions. Md. Rules 5–703, 5–705. Moreover, evidence "that might not otherwise be admissible may, under Rule 5–703(b), be properly admitted if it is relied upon by an expert or is necessary to illuminate testimony." *Brown, supra,* 180 Md.App. at 118, 949 A.2d 6. Rule 5–703(b) provides:

> If determined to be trustworthy, necessary to illuminate testimony, and unprivileged, facts or data reasonably relied upon by an expert ... may, in the discretion of the court, be disclosed. to the jury even if those facts and data are not admissible in evidence. Upon request, the court shall instruct the jury to use those facts and data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference.

Md. Rule 5–703(b). Therefore, the circuit court was permitted to admit the Lish Report because Dr. Snyder considered it in reaching her opinions and conclusions, even though the Lish Report contained otherwise inadmissible hearsay. The court was permitted to consider the Lish Report for the purpose of evaluating the validity and probative value of Dr. Snyder's opinion.

■■■ Mother argues that, because the circuit court considered her prior diagnosis of bipolar disorder, the circuit court must have impermissibly considered the Lish Report as substantive evidence rather than for the mere purpose of evaluating the validity and probative value of Dr. Snyder's

opinion. Mother maintains that the Lish Report was the only evidence presented mentioning bipolar disorder. This Court disagrees. There were several other sources discussing Mother's previous bipolar diagnosis and mental illness other than the Lish Report. Therefore, the court was well within its discretion to consider Mother's bipolar diagnosis. When there is an independent source for a fact in admissible evidence, the court is not precluded from considering that fact simply because it is also found in a piece of otherwise inadmissible evidence considered by an expert. *See Hutton v. State,* 339 Md. 480, 513, 663 A.2d 1289 (1995). In *Hutton,* the Court of Appeals stated:

> If trustworthy, but inadmissible, facts or data are relied upon by an expert in forming an opinion, the jury is instructed that the underlying facts are not substantive evidence. Md. R. Evid. 5–703(b). That, however, is not a concern in the instant case. The jury saw and heard the victim, so that the historical basis for the diagnosis was in evidence through a witness who had personal knowledge.

*Id.*

As in *Hutton,* Mother's diagnosis was in evidence through a source other than the Lish Report. Indeed, Mother testified that she had been previously diagnosed with bipolar disorder. Therefore, the circuit court was entitled to consider Mother's bipolar diagnosis as substantive evidence. Mother herself testified, in response to questions by her own attorney, that she had been diagnosed as being bipolar. The following exchange occurred:

> [COUNSEL]: Have you ever been diagnosed as being bipolar?
>
> [MOTHER]: It's an interesting term. In Dr. Lish's report which was early 2009.
>
> [COUNSEL]: Has you, have you—
>
> [MOTHER]: Yes, I believe it was in that report.
>
> [COUNSEL]: Okay. Do you have issues regarding mood swings?
>
> [MOTHER]: Yes, I can have mood swings.

Accordingly, the court could have reasonably concluded that Mother had been diagnosed with bipolar disorder based upon her own testimony.[7]

The records of Dr. Halpern, Mother's treating psychiatrist, were also admitted into evidence. Dr. Halpern's records included a written intake form on which Mother had reported that she suffered from anxiety, obsessive thinking, and high highs and low lows. This evidence indicated to the court that Mother's mental health was a concern that should be considered in a custody evaluation. Because there were other sources of evidence regarding Mother's bipolar diagnosis and mental health, there is no indication that the circuit court improperly considered the Lish Report as substantive evidence.

Moreover, the circuit court, in rendering its opinion, explicitly stated, "I don't really know whether [Mother] is bipolar or not." The circuit court discussed, at length, the deterioration of Mother's mental condition since the signing of the Agreement, and indicated that the deterioration of Mother's condition may or may not be related to a bipolar diagnosis. We, therefore, disagree with Mother's contention that "the sole basis of the decision to modify custody was based on the Lish Report." Rather, the circuit court considered many factors in determining that Mother's mental health had deteriorated.

We do not find merit in Mother's argument that the circuit court impermissibly considered the Lish Report as substantive evidence because the circuit court, in issuing its ruling, stated, "I have considered ... the psychological evaluation by Dr. Lish...." The circuit court was permitted to consider the Lish Report to evaluate the validity of Dr. Snyder's opinion,

---

7. Even if the Lish Report itself were not admissible, Mother was still able to testify independently that she had been diagnosed with bipolar disorder by Dr. Lish. Moreover, there was basis to question Mother on the issue regardless of whether the Lish report was admitted. Mother's bipolar diagnosis, as well as Mother's candor regarding her mental health, were issues in the case. Additionally, Mother had previously denied that she had been diagnosed with bipolar disorder in her response to Father's motion for mental health evaluation.

and there is no indication that the circuit court considered the Lish Report as substantive evidence. The circuit court also properly considered Mother's own testimony, in which she admitted to having been diagnosed with bipolar disorder. Accordingly, we hold that the circuit court did not err in admitting the Lish Report and considering it as the basis of Dr. Snyder's opinion.

Additionally, we find that, assuming *arguendo* the circuit court erred in admitting the Lish Report into evidence as substantive evidence, the error was harmless. "It has long been the policy in this state that [appellate courts] will not reverse a lower court judgment if the error is harmless." *Barksdale v. Wilkowsky*, 419 Md. 649, 657, 20 A.3d 765 (2011) (internal citation and quotation omitted). "The burden is on the complaining party to show prejudice as well as error." *Flores v. Bell*, 398 Md. 27, 33, 919 A.2d 716 (2007). A verdict will not be overturned unless the error was likely to have affected the verdict below; and "an error that does not affect the outcome of the case is harmless error." *Id.* The complaining party must demonstrate that the prejudice was "likely" or "substantial." *Barksdale, supra,* 419 Md. at 662, 20 A.3d 765. "[T]he general rule is that a complainant who has proven error must show more than that prejudice was *possible;* she must show that it was probable." *Id.* (emphasis in original).

Here, even if the court erroneously considered the Lish Report as substantive evidence, such error was harmless. It is well established that "an error in evidence is harmless if identical evidence is properly admitted." *Barksdale, supra,* 419 Md. at 663, 20 A.3d 765. In the instant case, Mother testified that she had been diagnosed with bipolar disorder, and her testimony regarding her bipolar diagnosis was properly admitted as substantive evidence. Accordingly, Mother is unable to carry her burden of demonstrating prejudice.

## II.

We next consider whether the circuit court improperly found a material change in circumstances to justify a modifica-

tion of the custody order. For the reasons set forth below, we conclude that the circuit court did not err in modifying custody.

Courts must engage in a two-step process when presented with a request to change custody. We have described the two-step analysis as follows:

> First, the circuit court must assess whether there has been a "material" change in circumstance. *See Wagner v. Wagner*, 109 Md.App. 1, 28 [674 A.2d 1] (1996). If a finding is made that there has been such a material change, the court then proceeds to consider the best interests of the child as if the proceeding were one for original custody. *See id.; Braun v. Headley*, 131 Md.App. 588, 610 [750 A.2d 624] (2000).

*McMahon v. Piazze*, 162 Md.App. 588, 594, 875 A.2d 807 (2005). Therefore, we first consider whether the trial court erred in finding that a material change in circumstances occurred. Second, we consider whether the court abused its discretion in modifying custody.

### A. Standard of Review

 This court reviews child custody determinations utilizing three interrelated standards of review. *In re Yve S.*, 373 Md. 551, 586, 819 A.2d 1030 (2003). The Court of Appeals described the three interrelated standards as follows:

> We point out three distinct aspects of review in child custody disputes. When the appellate court scrutinizes factual findings, the clearly erroneous standard of [Rule 8–131(c)] applies. [Second,] if it appears that the [court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [court's] decision should be disturbed only if there has been a clear abuse of discretion.

*Id.* at 586, 819 A.2d 1030. In our review, we give "due regard ... to the opportunity of the lower court to judge the credibility of the witnesses." *Id.* at 584, 819 A.2d 1030. We recognize that "it is within the sound discretion of the [trial court] to award custody according to the exigencies of each case, and ... a reviewing court may interfere with such a determination only on a clear showing of abuse of that discretion. Such broad discretion is vested in the [trial court] because only he sees the witnesses and the parties, hears the testimony, and has the opportunity to speak with the child; he is in a far better position than is an appellate court, which has only a cold record before it, to weigh the evidence and determine what disposition will best promote the welfare of the minor." *Id.* at 585–86, 819 A.2d 1030.

## B. Material Change of Circumstances

A material change of circumstances is a change in circumstances that affects the welfare of the child. *McMahon, supra,* 162 Md.App. at 594, 875 A.2d 807. The Court of Appeals has explained that although courts must engage in a two-step process in evaluating a petition to modify custody, the two-steps are often interrelated. The Court explained:

> [I]n the more frequent case ... there will be some evidence of changes which have occurred since the earlier [custody] determination was made. Deciding whether those changes are sufficient to require a change in custody necessarily requires a consideration of the best interest of the child. Thus, the question of "changed circumstances" may infrequently be a threshold question, but is more often involved in the "best interest" determination, where the question of stability is but a factor, albeit an important factor, to be considered.

*McCready v. McCready,* 323 Md. 476, 482, 593 A.2d 1128 (1991). "In [the custody modification] context, the term 'material' relates to a change that may affect the welfare of a child." *Wagner,* 109 Md.App. at 28, 674 A.2d 1 (1996). "The burden is then on the moving party to show that there has been a material change in circumstances since the entry of the final

custody order and that it is now in the best interest of the child for custody to be changed." *Sigurdsson v. Nodeen,* 180 Md.App. 326, 344, 950 A.2d 848 (2008).

In the instant case, we find that there was sufficient evidence to support a finding that a material change of circumstances had occurred. Mother argues that her mental illness was an issue that had been present throughout the parties' marriage, and therefore, the mental illness did not constitute a material change of circumstances. The circuit court, however, did not find that Mother's mental illness itself was a material change; rather, the court determined that the worsening of her symptoms was a material change. The court stated that there had been "an extreme deterioration" in Mother's symptoms. We find that there was sufficient evidence for the circuit court's conclusion that Mother's mental health had severely deteriorated and that the deterioration of Mother's mental health adversely affected the children.

The court set forth the evidence it considered before rendering its opinion, stating:

Now in my decision, ladies and gentlemen, I have considered the testimony of Amanda Franks, (unclear), Dr. Rebecca Snyder, Dr. Elise Abromson, the psychological evaluation by Dr. Lish, the treatment notes of Dr. Halpern; witnesses, Mary Anne Grenice (phonetic), Amanda Franks, Drew Tracy, Lisa Adkins. There were three stipulation witnesses, Luther Reynolds, Ron Romig, Lisa Lepore, and then Sergeant Pickert [sic] I believe was our last witness before [Mother] went on the stand.

Now I have for the last three days had the opportunity of observing both the Plaintiff and the Defendant and I've had the opportunity of seeing them testify and incidentally the report that Dr. Snyder did I guess confirms my views that I noticed of both of them.

In reaching its conclusion, the circuit court considered various indicators that Mother's mental health had deteriorated, including her assault of Grenis at the youth baseball game, her apparent lack of control over her actions, and her tendency to

minimize responsibility and difficulty in appreciating the effect of her actions on her family. The court also noted that Mother did not appreciate how hurtful her conduct was to the parties' son. The court emphasized Mother's "inability to see what her behavior has done to [her son], now it's not that it has done great damage. It's that it has caused him to be crushed." Accordingly, we hold that the circuit court did not err in finding that Mother's mental health deteriorated and that the deterioration was a material change of circumstances that adversely affected the children.

## C. Custody Modification

 Having found a material change in circumstances, the circuit court then considered the best interests of the children and modified custody. When making a custody determination, a trial court is required to evaluate each case on an individual basis in order to determine what is in the best interests of the child. *Wagner*, 109 Md.App. at 39, 674 A.2d 1 (citing *Bienenfeld v. Bennett–White*, 91 Md.App. 488, 503, 605 A.2d 172 (1992)). Factors the trial court may use in this determination include:

> [A]mong other things, the fitness of the persons seeking custody, the adaptability of the prospective custodian to the task, the age, sex and health of the child, the physical, spiritual and moral well-being of the child, the environment and surroundings in which the child will be reared, the influences likely to be exerted on the child, and, if he or she is old enough to make a rational choice, the preference of the child.

*Id.* (internal citations omitted). These factors make it clear that the best interest of the child is not a factor of its own. Instead, it is the goal that all other factors seek to reach. *Id.* In determining whether joint custody is appropriate, the capacity of the parties to communicate and reach shared decisions regarding the children's welfare is of paramount importance. *Taylor v. Taylor*, 306 Md. 290, 303, 508 A.2d 964 (1986).

In the instant case, the circuit court considered various factors in order to determine a custody arrangement that would be in the best interest of the children. The court explicitly stated that it was taking into account factors including but not limited to:

the fitness of the parents, character and reputation of the parties, desire of the natural parents and agreements between them, potentiality in maintaining natural family relations, the preference of the child, material opportunities affecting the future life of the child, age, health, and sex of the child, residence of parents and opportunities for visitation, length of separation from the natural parents and prior voluntary abandonment and surrender.

The court maintained joint legal custody but granted Father tie-breaking authority. Regarding legal custody, the court stated in its ruling:

[I]n considering whether the custody arrangement should be changed, as to legal custody I've considered the capacity of the parents to communicate, reach shared decisions affecting the child's welfare, the willingness of the parents to share custody, sincerity of parents, I must say there's a differences [sic] in these people, but generally you essentially have the same values.

\* \* \*

Given that I do feel that you should share responsibility for the major decisions that do affect the lives of your children, but on the other hand I am concerned about trivial matters that might result and might result in renewed litigation. . . . I believe that in this case . . . a tie-breaker is appropriate, sort of a proactive provision to anticipate a post-divorce dispute.

\* \* \*

[I]n this case . . . I think there should be a tie-breaker and that's going to be [F]ather. And, ah, it's going to be [F]ather because [F]ather has demonstrated an ability to be stable.

The court also modified the physical custody arrangement, stressing that it was doing so because of the increasing conflict between the parents and their inability to communicate effectively. The court stated:

As to, I also believe there has to be a change in the physical custody because what is occurring now is the conflict is escalating. It's only gonna [sic] continue to escalate. It's not gonna [sic] get any better.

The court modified the physical custody arrangement, providing that the children would primarily reside with Father and would spend alternate weekends with Mother. On the weeks when Mother did not have the children over the weekend, the children would have an overnight visit with Mother on Thursday nights. The order also provided for a vacation and holiday rotation schedule. The court stressed that it was modifying the physical custody arrangement in order to create more stability for the children, stating, "[T]here has got to be some stability put back in this home and things are not gonna [sic] get better all of a sudden." The court stated that if Father at some point sought sole physical custody, he would have to seek a custody modification through the court, but if things improved and the parties wanted to move to a fifty-fifty shared custody arrangement, they could do so by agreement and not through the court.

We hold that the circuit court did not abuse its discretion in modifying the custody arrangement. After hearing significant evidence and considering the best interests of the children, the court reasonably concluded that the deterioration of Mother's mental health had an adverse affect on the children and that reducing the amount of time the children stayed at Mother's home would be in their best interests. We conclude that the circuit court's factual findings were not clearly erroneous, and the circuit court's ruling was founded upon sound legal principles. The circuit court's decision was not "well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *In re Yve S., supra*, 373 Md. at 583–84, 819 A.2d 1030. Accord-

ingly, we affirm the circuit court's modification of the custody arrangement.

## III.

We now turn to whether the circuit court abused its discretion by requiring Father to pay the fees of Winters, the children's best interest attorney, and Dr. Snyder, the court appointed evaluator. Because the circuit court did not conduct the appropriate analysis of the parties' financial resources and financial needs, we vacate the circuit court's order granting fees and remand for further proceedings.

### A. Standard of Review

We review the award of counsel fees under the abuse of discretion standard. *Meyr v. Meyr,* 195 Md.App. 524, 552, 7 A.3d 125 (2010). The circuit court's decision regarding the award of fees "will not be reversed unless a court's discretion was exercised arbitrarily or the judgment was clearly wrong." *Petrini v. Petrini,* 336 Md. 453, 468, 648 A.2d 1016 (1994).

### B. Attorney's Fees

Father contends that the circuit court failed to consider the parties financial resources and needs when it ordered him to pay Winters' and Snyder's fees. During the custody modification trial, the circuit court indicated that it would not address financial issues at that time, and that such matters would be reserved for a separate proceeding. Father was asked, on cross-examination by Mother's counsel, about his salary. Mother asserted that a party's financial condition was a factor to be considered in connection with the party's ability to care for the children. Father testified that he earned $127,000 per year. The circuit court expressly stated, "I thought we were gonna [sic] leave financial matters out of this." Moreover, when Father's counsel attempted to ask a question relevant to the issue of costs and attorney's fees, he was precluded from doing so, and the court stated, "I think there needs to be a separate, ah, separate hearing on those issues." The following colloquy occurred between the court and Father's counsel:

THE COURT: How is this relevant?

[COUNSEL]: Well, if she's asking for attorneys' fees I think it's appropriate to get into what—

THE COURT: Well, we're not gonna [sic] litigate that matter today.

[COUNSEL]: Okay. Well, I should not inquire of the witness about that issue? (Pause.) So should I refrain from financial issues as well?

THE COURT: I think there needs to be a separate, ah, separate hearing on those issues.

\* \* \*

THE COURT: I think we ought to separate it for a separate hearing as to all financial issues.

Accordingly, no inquiry was made into Mother's financial resources or needs, and no further inquiry was made regarding Father's finances.

After trial, Winters filed a petition for attorney's fees and petition for payment of fees of court appointed evaluator. Both parties filed responses to both petitions, and each party included significant documentation of his or her financial status. The court did not hold a hearing on the financial issues.[8] On June 13, 2011, the court ordered Father to pay the balance of Winters' attorney's fees in the amount of $23,237.50. On June 15, 2011, the court ordered Father to pay the balance of Dr. Snyder's fees in the amount of $3,669.00. Father filed motions to reconsider, alter, or amend both orders, which the circuit court denied.

A court order requiring that a party involved in a custody dispute pay counsel fees to a best interest attorney is authorized by § 1–202 of the Family Law Article, which provides in pertinent part:

---

8. Notably, on November 4, 2011, the court held a separate hearing on Mother's request for a contribution toward her own attorney's fees. The court denied Mother's request for attorney's fees.

(a) *In general.*—In an action in which custody, visitation rights, or the amount of support of a minor child is contested, the court may:

(1) (i) appoint a lawyer who shall serve as a child advocate attorney to represent the minor child and who may not represent any party to the action; or

(ii) appoint a lawyer who shall serve as a best interest attorney to represent the minor child and who may not represent any party to the action; and

(2) impose counsel fees against one or more parties to the action.

Md.Code (1984, 2006 Repl.Vol.), § 1–202 of the Family Law Article ("FL").[9] This section does not set forth specific factors a court should consider in awarding counsel fees for a best interest attorney. The Court of Appeals and this Court have, however, indicated "that the factors set forth in F.L. § 12–103(b), are relevant to the analysis." *Meyr, supra,* 195 Md.App. at 555, 7 A.3d 125 (citing *Taylor v. Mandel,* 402 Md. 109, 134, 935 A.2d 671 (2007) ("[W]henever a court assesses guardian ad litem fees under Section 1–202, the court should consider various factors, such as those articulated in Section 12–103(b) of the Family Law Article.")). FL § 12–103(b) provides:

II. Before a court may award costs and counsel fees under this section, the court shall consider:

I. the financial status of each party;

II. the needs of each party; and

III. whether there was substantial justification for bringing, maintaining, or defending the proceeding.

FL § 12–103(b).

Here, although the circuit court was presented with significant information regarding the financial status of the parties,

---

**9.** In their briefs, both parties incorrectly cite FL § 12–103 as the section governing the payment of best interest attorney's fees. Section 12–103 addresses attorney's fees of the parties in child custody cases but does not address best interest attorney's fees.

there is no indication that the court expressly considered any of the factors listed in FL § 12–103(b). The orders of the circuit court did not include any explanation of the basis for the court's decision, and there is nothing in the record to indicate that the court made any findings of fact to justify its order that Father pay the outstanding fees.

 Mother contends that because Father did not request a hearing on the two fee-related motions pursuant to Maryland Rule 2–311, Father should not be permitted to argue the issues on appeal. We disagree. A hearing is not always required before a court determines the apportionment of fees, and we do not find that the circuit court was necessarily required to entertain a hearing in this case. The court is, however, required to state the basis for its determination. Here, each party provided significant documentation of his or her finances with their responses, and the court may have reasonably based its determination on that documentation. Because the court did not state the basis for its determination, however, we are unable to properly review the decision. *Ledvinka v. Ledvinka*, 154 Md.App. 420, 432–33, 840 A.2d 173 (2003) ("Based on the record, we conclude that the trial court failed to make findings of fact to justify the award of attorney's fees. Absent the court stating the basis for its determination, this Court cannot properly review the decision."); *Painter v. Painter*, 113 Md.App. 504, 529, 688 A.2d 479 (1997) ("In a case in which bills for legal services are challenged, [the trial court] ought to state the basis for [its] decision so it can be reviewed, if necessary, on appeal.") (internal quotation omitted). Accordingly, we remand for the limited purpose of determining the fees for the best interest attorney and court appointed evaluator in accordance with the statute.

**JUDGMENT MODIFYING CUSTODY AFFIRMED. ORDER GRANTING FEES FOR BEST INTEREST ATTORNEY AND COURT APPOINTED EVALUATOR VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR FREDERICK COUNTY FOR FURTHER PRO-**

CEEDINGS CONSISTENT WITH THIS OPINION. AP-
PELLANT/CROSS–APPELLEE TO PAY THE COSTS.